**WEST COAST SHEET METAL,
INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 90–1420.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 21, 1991.

Decided July 16, 1991.

Fred M. Plevin, with whom James K.
Smith was on the brief, San Diego, Cal., for
petitioner.

Frederick C. Havard, Atty., N.L.R.B.,
with whom Jerry M. Hunter, Gen. Counsel,
and Aileen A. Armstrong, Deputy Associate Gen. Counsel, were on the brief, Washington, D.C., for respondent.

Robert A. Cantore, with whom Steven M.
Rehaut, Los Angeles, Cal., for Sheet Metal
Workers Trust Fund, and Richard D. Prochazka, San Diego, Cal., for Sheet Metal
Workers' Intern. Ass'n, Local Union 206,
were on the joint brief, for intervenors.

Before WALD, RUTH BADER
GINSBURG and THOMAS, Circuit
Judges.

Opinion for the Court filed by Circuit
Judge RUTH BADER GINSBURG.

rather doubt the government would make this mistake (if it is a mistake) again.

RUTH BADER GINSBURG, Circuit Judge:

An "interest arbitration" clause in a collective-bargaining agreement authorizes binding arbitration of deadlocks that occur during renewal negotiations. In *International Brotherhood of Electrical Workers, Local No. 113 ("Collier Electric")*, 296 N.L.R.B. No. 144 (Oct. 4, 1989), the National Labor Relations Board held that a union does not commit an unfair labor practice by seeking in good faith to enforce an interest arbitration clause against an employer who has withdrawn, mid-term, from the multiemployer association that negotiated the clause. According to *Collier Electric*, in such circumstances, a union lawfully may submit disputed issues to interest arbitration, seek to compel arbitration through a suit in federal court, or attempt to enforce any arbitration award in federal court, provided that (1) the employer at least arguably remained bound by the interest arbitration clause, and (2) the union, prior to invoking interest arbitration, negotiated in good faith.[1]

In this petition for review, we consider an employer's challenge to the Board's *Collier Electric* doctrine. We conclude that *Collier Electric* is consistent with the National Labor Relations Act ("NLRA," "the Act") and that the Board did not err in applying to this case the precedent set in *Collier Electric*. Accordingly, we deny the petition for review.

## I. BACKGROUND

### A. *The 1983 Bargaining Agreement*

In 1983, intervenor Local 206 of the Sheet Metal Workers' International Association ("Local 206") and the San Diego chapter of the Sheet Metal and Air Conditioning Contractors' National Association ("SMACNA–San Diego") entered into a three-year collective-bargaining agreement ("CBA"). The parties—including petitioner West Coast Sheet Metal, Inc. ("West Coast"), then a member of SMACNA—executed copies of the agreement that included both the "Standard Form of Union Agreement," governing national matters, and the "Local 206 Addenda," which set local standards.

Two provisions of the 1983 CBA sparked this controversy. First, Article X, Section 8 of the national agreement—the "interest arbitration" clause [2]—provided that "any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this agreement shall be settled" by submitting the dispute to the National Joint Adjustment Board ("NJAB"), consisting of four members from the Sheet Metal Workers' International Association and four from SMACNA's national organization. To break deadlocks, the NJAB had authority under this provision to impose contractual terms, but only by unanimous decision.[3]

[1]. The Board has applied the *Collier Electric* holding in at least five cases other than the one we review. *See* International Bhd. of Elec. Workers, Local Union No. 46, 302 N.L.R.B. No. 39 (Mar. 29, 1991) (finding union violation because union bargained in bad faith before submitting dispute to interest arbitration); Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 301 N.L.R.B. No. 32 (Jan. 15, 1991) (finding union violation because interest arbitration provision not arguably applicable to employer); Sheet Metal Workers Local Union No. 20, 301 N.L.R.B. No. 29 (Jan. 22, 1991) (finding no violation); Local Union No. 54 of Sheet Metal Workers' Int'l Ass'n, 297 N.L.R.B. No. 104 (Jan. 31, 1990) (same); Sheet Metal Workers' Int'l Ass'n, Local Union No. 283, 297 N.L.R.B. No. 103 (Jan. 31, 1990) (same).

[2]. West Coast suggests in passing that the clause in question is not a true interest arbitration provision. We follow the Board and the courts that have considered the issue, however, in characterizing Article X, Section 8 as an interest arbitration clause. *See, e.g., Sheet Metal Workers Int'l Ass'n, Local No. 162 v. Jason Mfg., Inc.*, 900 F.2d 1392, 1396 (9th Cir.1990); *Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal Co.*, 786 F.2d 1459 (11th Cir.1986) (per curiam); Sheet Metal Workers Int'l Ass'n Local Union 206, 298 N.L.R.B. No. 107, at 2 (June 11, 1990).

[3]. Article X, Section 8 provided, in particular:

(a) Should the negotiations for renewal of this agreement become deadlocked in the opinion of the Local Union or of the Local Contractors' Association, or both, notice to that effect shall be given.... [If the differences between the parties cannot be conciliated,]

The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment

Second, the Local 206 Addenda to the 1983 CBA contained a "most favored nation" provision, according to which "[a]ny agreements entered into by Local 206 which are more favorable than those included herein will be offered to the employers signatory to this agreement."

B. *1984–86 Negotiations and the Interest Arbitration Clause*

In May 1984, the Executive Manager of SMACNA–San Diego, Chuck Baxter, wrote Local 206, asserting that the union had entered into agreements with employers outside SMACNA that did not include the Article X, Section 8 interest arbitration provision. Baxter stated that SMACNA–San Diego "ha[d] voted to ... accept this exclusion as part of the agreement" with Local 206, citing the "most favored nation" clause. Local 206 did not respond to this letter. The matter soon resurfaced, however, during June 1984 wage reopener negotiations: the minutes of the June 18 meeting between SMACNA–San Diego and Local 206 show that Baxter "reminded" the union negotiating committee that the multiemployer association "had invoked the 'favored nations clause' of the contract to remove Article X, Section 8," whereupon a union representative, Jerry Thompson, orally "acknowledged that this is true."

The status of the interest arbitration clause next came to the fore almost two years later, when negotiations for a new contract began in May 1986. By that time, West Coast had notified Local 206 of its withdrawal from SMACNA and its intention to negotiate a new agreement independent of the multiemployer association. At the first negotiating session, according to the testimony of a West Coast witness in the Board proceedings, union representative Thompson said that Article X, Section 8 "is out because of the earlier actions of SMACNA." On June 27, however, nine days after the negotiations stalled, Local 206 wrote West Coast that the talks were deadlocked and that it intended to invoke the interest arbitration procedures of Article X, Section 8.[4] On July 2, two days after the contract expired, West Coast protested Local 206's invocation of the interest arbitration provision and put into effect its last offer; that same day, the union submitted the dispute to the NJAB for hearing and decision.

West Coast refused to attend the NJAB hearing. It did, however, set forth its objections to the arbitration proceedings in a three-page letter (plus attachments) sent to the NJAB's management members. West Coast urged, in conclusion: "If the management members of the NJAB are willing to take instructions, this letter is to be considered as instructions to deadlock so that the NJAB not purport to impose any contract upon West Coast Sheet Metal...."[5] The NJAB rejected West Coast's arguments[6] and imposed a new contract upon the parties that provided for journeymen's wage increases of $1.00, $.50, and $.50 per hour over the three years of the agreement's term.[7]

Board. The unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received written notification of its failure.

4. West Coast apparently received the letter on June 30, the last day on which the 1983 CBA was in force.

5. West Coast also filed a grievance with the Local Joint Adjustment Board.

6. The NJAB decided, *inter alia*, that the "most favored nation" provision applied only to economic matters, such as wages and fringe bene-

fits, and did not cover the interest arbitration clause.

7. The NJAB also purported to include a new interest arbitration clause, along with a proviso that "[i]n the event the NLRB or any court having jurisdiction over the matter finds any provision of the agreement imposed is not a mandatory subject [of bargaining], that provision will be deleted." The California district court reviewing the award held that the interest arbitration provision was nonmandatory, but that the award could be confirmed with that provision severed. *See Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.,* Civ. No. 86–1723–G, mem. op. at 13 (S.D. Cal. Jan. 23, 1991).

### C. Unfair Labor Practice Proceedings Before the ALJ

By the time of its letter to the NJAB, West Coast had already filed an unfair labor practice charge with the NLRB; it filed an additional charge one week after receiving notification of the NJAB award. The Board's General Counsel issued a complaint, in which West Coast's charges were consolidated with virtually identical charges made by other San Diego sheet metal companies. The General Counsel alleged that Local 206's declaration of a deadlock and submission of the dispute to the NJAB violated the union's duty under section 8(b)(3) of the NLRA to bargain in good faith,[8] and "coerce[d] and restrained" West Coast "in the selection of [its] representatives for the purposes of collective bargaining," thus violating section 8(b)(1)(B).[9] After Local 206 filed suit in the District Court for the Southern District of California to confirm the NJAB award, the General Counsel amended the complaint to assign that action as an additional violation of sections 8(b)(1)(B) and 8(b)(3).

An Administrative Law Judge ("ALJ") ruled that Local 206 had violated sections 8(b)(1)(B) and 8(b)(3) of the Act in three ways. First, she held, the union had illegally insisted to impasse on inclusion of a new interest arbitration clause and upon contributions to industry funds, both nonmandatory subjects of bargaining. *Sheet Metal Workers Int'l Ass'n Local Union 206*, mem. op. at 7 (Mar. 10, 1987) ("ALJ Op."). Second, she declared that Local 206 had bargained in bad faith by failing "to mention the applicability of interest arbitration or contributions to industry funds prior to declaring a deadlock and referring the

negotiations to the NJAB." *Id.* Third, the ALJ stated that Local 206 had violated the Act both by submitting the dispute to the NJAB without West Coast's clear and unmistakable waiver of its right to select its own bargaining representative and by attempting to confirm the NJAB award in federal district court. *Id.* at 8–10. In making the latter two determinations, the ALJ relied upon evidence that Local 206 had disavowed Article X, Section 8 earlier during the bargaining, and upon the "consideration" that the NJAB was composed of West Coast's "competitors who are members of SMACNA or the Union, [West Coast's] bargaining adversary." *Id.* at 7; *see also id.* at 10.[10]

### D. The Board's Decision and the Collateral Proceedings in Federal Court

The Board rejected the ALJ's first finding, noting the total absence of any evidence that Local 206 had bargained to impasse on inclusion of a new interest arbitration clause. *Sheet Metal Workers Int'l Ass'n Local Union 206*, 298 N.L.R.B. No. 107, at 8 & n. 3 (June 11, 1990) ("Board D & O").[11] The Board rejected the second and third findings as well, on the strength of its intervening decision in *International Brotherhood of Electrical Workers, Local No. 113 ("Collier Electric")*, 296 N.L.R.B. No. 144 (Oct. 4, 1989). *Collier Electric* held, in circumstances resembling those of the present case, that a union does not commit an unfair labor practice by submitting deadlocks to interest arbitration, or by filing a court suit to compel arbitration or enforce an arbitration award, provided that (1) the CBA's interest arbitration clause arguably covers an employer who has with-

---

**8.** Section 8(b)(3) of the Act provides that it shall be an unfair labor practice for a labor organization that represents employees "to refuse to bargain collectively with an employer." 29 U.S.C. § 158(b)(3). Like section 8(a)(5), 29 U.S.C. § 158(a)(5), the counterpart provision prohibiting employers from refusing to bargain, section 8(b)(3) has been interpreted to require good-faith bargaining.

**9.** Section 8(b)(1) of the Act provides, in pertinent part, that it shall be an unfair labor practice for a labor organization or its agents "to restrain or coerce ... (B) an employer in the

selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1).

**10.** About two months after the ALJ's decision, the NLRB conducted an election prompted by a successful decertification petition. Local 206 lost the election and was decertified as the bargaining representative for West Coast's employees.

**11.** Nor was there any evidence to support the ALJ's finding that the union bargained to impasse over contributions to industry funds.

drawn from a multiemployer association in the middle of the contract's term, and (2) the union, before submitting unresolved issues to arbitration, bargained in good faith. *Id.* at 10–11.[12] The Board concluded that West Coast was at least arguably bound by the interest arbitration provision and that the evidence did not support the ALJ's finding of bad-faith bargaining on Local 206's part. Board D & O at 6–8. The Board therefore dismissed the complaint.

After the Board's decision, the federal District Court for the Southern District of California lifted the stay it had imposed on the proceedings Local 206 initiated to confirm its NJAB award. On cross-motions for summary judgment, the district court held that, beyond genuine dispute, West Coast was bound by the interest arbitration clause, notwithstanding its mid-term withdrawal from SMACNA. Specifically rejecting West Coast's argument that Article X, Section 8 had been removed from the contract by oral modification, the court confirmed the NJAB award. *See Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.*, Civ. No. 86–1723–G, mem. op. (S.D. Cal. Jan. 23, 1991). West Coast's appeal from that decision is now pending before the Ninth Circuit.

In this proceeding, we review West Coast's challenges to the Board's dismissal of the unfair labor practice charges against Local 206. First, West Coast contends, the *Collier Electric* doctrine is inconsistent with section 8(b)(1)(B) and is an abdication of the Board's responsibility to adjudicate unfair labor practice charges on the merits. Second, West Coast maintains, even if the *Collier Electric* doctrine were permissible, the Board still should have found, based on "undisputed evidence," that Local 206 had violated section 8(b)(3) by engaging in bad-faith bargaining. We consider these arguments in turn and affirm the Board's dismissal of the complaint.

## II. THE BOARD'S *COLLIER ELECTRIC* DOCTRINE

 Section 8(b)(1)(B) of the NLRA provides that it shall be an unfair labor practice for a union to "restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). The Act does not define the words "restrain" or "coerce"; instead, the Act delegates primary responsibility for elaborating these general terms to the Board, as the agency charged with administering the Act.

Our review of the Board's interpretation is guided by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Hammontree v. NLRB*, 925 F.2d 1486, 1491 (D.C.Cir.1991) (en banc). Following the path that *Chevron* marked, we ask, first, whether the text or legislative history of the Act reveals any congressional intention on the "precise question at issue"; if so, we "must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. at 2781. If, however, the text and history are "silent or ambiguous with respect to the specific issue," we proceed to the second *Chevron* step and inquire "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

### A. "Chevron I" *Analysis of the* Collier Electric *Doctrine*

The specific issue presented by the *Collier Electric* doctrine is whether a union may, consistent with section 8(b)(1)(B), pursue in good faith contractual remedies under an interest arbitration clause, negotiated by a multiemployer association, against a single employer who has withdrawn, midterm, from the association. The text of section 8(b)(1)(B) does not home in on this precise question. We turn, therefore, to that provision's sparse legislative history.[13]

---

**12.** The Board stated further that, on the filing of an "appropriate charge," it would "still review [the parties'] bargaining to ensure that both parties have negotiated in good faith prior to the submission of the unresolved issues to arbitration." *Id.* at 11–12.

**13.** The General Counsel's complaint also alleged that both Local 206's submission of the dead-

Section 8(b)(1)(B) was one of the Taft–Hartley amendments designed to address perceived abuses of union power. As West Coast observes, the provision was adopted in part to prevent unions from exercising coercive influence over employers' decisions to join or withdraw from multiemployer bargaining associations.[14] The Senate report explained that section 8(b)(1)(B)

> proscribes unions and their agents from interfering with, restraining, or coercing employers in the selection of their representatives for the purposes of collective bargaining.... Thus, a union or its responsible agents could not, without violating the law, coerce an employer into joining or resigning from an employer association which negotiates labor contracts on behalf of its members....

S.REP. No. 105, 80th Cong., 1st Sess. 21 (1947), *reprinted in* 1 NLRB, LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT RELATIONS ACT, 1947, at 407, 427 (1948) (hereinafter "LEGISLATIVE HISTORY"); *see also* 93 CONG. REC. 4266 (1947), *reprinted in* 2 LEGISLATIVE HISTORY at 1077 ("The bill prevents a union from dictating to an employer on the question of bargaining with union representatives through an employer association.") (statement of Senator Ellender).

Neither the quoted passage from the Senate report nor Senator Ellender's statement, however, is particularly illuminating as to what practices would, in the context relevant here, constitute "restraint" or "coercion" of an employer's right to select its bargaining representative. The only guidance we have been able to find on the subject comes from a floor statement by Senator Taft, the bill's sponsor in the Senate (and one of the two persons for whom the bill is popularly named). Taft described section 8(b)(1)(B) as targeting un-

ions that, by refusal to meet with employers not tied to multiemployer bargaining associations, forced employers to bargain on a nationwide basis:

> This is the only section in the bill which has any relation to Nation-wide bargaining. Under this provision it would be impossible for a union to say to a company, "We will not bargain with you unless you appoint your national employers' association as your agent so that we can bargain nationally." Under the bill the employer has a right to say, "No, I will not join in national bargaining. Here is my representative and this is the man you have to deal with."

93 CONG. REC. 3953–54 (1947), *reprinted in* 2 LEGISLATIVE HISTORY at 1012.

Taft's remarks thus confirm that section 8(b)(1)(B) renders unlawful a union's refusal to meet with an independent employer's designated representative and insistence that the company instead designate the national employers' association as its representative for collective bargaining. In both the present case and in *Collier Electric*, however, the union did not contest the employer's withdrawal from the multiemployer association. Nor, we underscore, did the union refuse to bargain with the employer's designated representative; indeed, the union met with that representative and bargained to impasse. The Senate debates over section 8(b)(1)(B) did not address the kind of union activity involved in *Collier Electric*—a union's good-faith pursuit of contractual remedies against an employer who had withdrawn from a multiemployer association—let alone did they brand this action a section 8(b)(1)(B) violation.

We conclude, then, that Congress did not express any clear and unambiguous view

locked issues to interest arbitration and its suit to confirm the arbitration award violated section 8(b)(3). This allegation, so far as it is not simply duplicative of the allegation that the union violated section 8(b)(1)(B), seems to have depended upon two assumptions: that the union had no good-faith belief in or objective basis for its contractual claim, and that it bargained in bad faith by intentionally concealing its position that the interest arbitration provision remained in the contract. These two subsidiary allegations amount to the charge that, even un-

der the *Collier Electric* standard, the union's conduct violated the NLRA. We consider them, therefore, in Part III of this opinion, where we examine the propriety of the Board's application of *Collier Electric* to the facts of this case.

**14.** We do not focus, for present purposes, on the part of section 8(b)(1)(B) that forbids unions from restraining or coercing employers in the selection of their representatives for the adjustment of grievances.

on the *Collier Electric* issue. We turn, therefore, to the second *Chevron* tier, under which we must affirm the Board's decision if it is "based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2782.

## B. *"Chevron II" Analysis of the* Collier Electric *Doctrine*

In *Collier Electric*, the Board held that a union's good-faith pursuit of contractual remedies under an interest arbitration clause did not constitute "restraint" or "coercion" within the meaning of section 8(b)(1)(B). The Board's reading, we are satisfied, is reasonable and consistent with the legislative history of section 8(b)(1)(B). The Senate debates indicate that Congress was targeting union practices absent in *Collier Electric*, *i.e.*, the conditioning of bargaining upon an employer's affiliation with a multiemployer association. Those debates also suggest that Congress did not mean to outlaw all union actions that might tend to make employers more likely to assent to nationwide bargaining, or less eager to withdraw from multiemployer associations. When the bill was reported from the Senate Committee on Labor and Public Welfare,[15] section 8(b)(1)(B) would have made it an unfair labor practice for a union to *"interfere with,* restrain or coerce an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." S. 1126, 80th Cong., 1st Sess. § 8(b)(1) (1947), *reprinted in* 1 Legislative History at 99, 112 (emphasis added). The Senate deleted the words "interfere with," apparently because their inclusion "would harmfully prevent the *legitimate efforts of unions to attain or preserve* effective bargaining on a company-wide or industry-wide basis." 93 Cong. Rec. 5106 (1947), *reprinted in* 2 Legislative History at 1454 (remarks of

Sen. Murray) (emphasis added). The legislative history does not make clear precisely which union efforts are "legitimate" and which (other than those mentioned in Taft's remarks) are illegitimate and coercive. We think, however, that the Board could reasonably classify the peaceful, good-faith resort to legal process as a legitimate effort to preserve the fruits of prior industry-wide bargaining, not as unlawful "restraint" or "coercion."

West Coast nevertheless insists that the Board's *Collier Electric* doctrine is inconsistent with the Act, because, West Coast claims, the Board allowed a "fundamental" statutory right to be relinquished without requiring a showing that it was "clearly and unmistakably waived." In support of this contention, West Coast invokes a line of cases, both from the Board and from the courts, holding that a statutory right may be relinquished only by clear and unmistakable waiver.[16]

We find this argument misguided. "Waiver" is a concept that operates to counter claims that a recognized right has been infringed; it does not apply beyond the scope of the right that has allegedly been invaded. In *Collier Electric*, however, the Board in effect decided that the employer's right at issue is not so sweeping as West Coast conceives it to be. On the Board's analysis, which we have found to be reasonable, section 8(b)(1)(B)'s ban on union "restraint" and "coercion" does not bestow upon an employer, who has withdrawn mid-term from a multiemployer association, any right to be free from a union's invocation, after bargaining in good faith to impasse, of an at least arguably applicable interest arbitration provision. In the present case, therefore, the Board had no occasion to determine whether West Coast had "waived" its section 8(b)(1)(B) right, "clearly and unmistakably" or other-

---

**15.** The version of the bill originally passed by the House contained no analogue to section 8(b)(1)(B).

**16.** *See, e.g., Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 707–09 & 708 n. 12, 103 S.Ct. 1467, 1476–1477 & 1477 n. 12, 103 S.Ct. 1467 (1983); *Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 676 F.2d 826, 831 (D.C.Cir.1982); *International Ass'n of Heat & Frost Insulators & As-*

*bestos Workers Local Union No. 27 (Master Insulators),* 269 N.L.R.B. 719, 721 (1984). *But cf. Local Union 1395, International Bhd. of Elec. Workers v. NLRB,* 797 F.2d 1027, 1031 (D.C.Cir. 1986) (upholding, as consistent with the "clear and unmistakable waiver" standard, the "Board's ... approach, which treats waiver of sympathy strikes essentially as a matter of straightforward contract interpretation").

wise; instead, the key question is simply whether Local 206 infringed that right, either by unreasonably invoking the interest arbitration clause, or by bargaining in bad faith before invoking the clause.

West Coast seeks to fend off this conclusion by emphasizing certain language in the Board's *Collier Electric* opinion that, West Coast claims, shows that the Board has abdicated its responsibility to decide unfair labor practice questions on the merits. The Board wrote:

> [W]e leave to the courts' determination the question of whether an employer is bound to the interest arbitration provision. In doing so, we recognize that we leave a potential unfair labor practice question unresolved, because, if the employer is found by the court not to be bound to the provision, in retrospect the union's pursuit of the matter to interest arbitration might have been found by the Board to have been an unfair labor practice.

296 N.L.R.B. No. 144, at 12. In this passage, West Coast suggests, the Board acknowledges that it might reasonably have found the union's pursuit of a good-faith, but ultimately incorrect, contractual claim, to have been an unfair labor practice. If that is so, West Coast contends, the Board is obliged to interpret the contract itself; if the Board determines that the union's claim is not justified under the collective-bargaining agreement, West Coast maintains, the Board should declare the union's pursuit of that claim to be an unlawful restraint and coercion of the employer's right to select its own bargaining representative.

We think, however, that West Coast misperceives the thrust of the quoted language from *Collier Electric.* The passage, it is true, is hardly a model of the careful drafter's art.[17] In context, however, we understand the Board to be conveying simply this: the terms "restraint" and "coercion" as used in the Act are not self-defining and inelastic. The Board's allowance that the position West Coast advances might be a reasonable construction of the Act does not mean that the Board's selection of another construction—one we have found to be reasonable—is impermissible. Responding specifically to West Coast's insistence that the Board, not the courts, should wield the laboring oar in interpreting the contract, we note that employers in West Coast's situation are free to obtain an independent determination from the federal courts concerning the very arguments that West Coast would require the Board to entertain.[18] We can hardly say that employers so situated will receive less adequate protection before the federal courts than they would receive before the Board; indeed, it has often been said that the interpretation of contracts is

---

17. Indeed, the Board goes on to suggest that it "has the discretion to withhold its authority to adjudicate alleged unfair labor practices when doing so effectuates national labor policy," citing *United Technologies Corp.,* 268 N.L.R.B. 557 (1984), and *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971). Clearly, however, the Board was not exercising such discretion in this case, for in *Collier Electric,* unlike *United Technologies* and *Collyer Insulated Wire,* the Board did not invite or permit the parties to return post-arbitration for Board consideration of the unfair labor practice charges, nor did it even leave an unfair labor practice question for the arbitrator to consider. *Cf. Hammontree,* 925 F.2d at 1490–91, 1496–97 (discussing Board's "deferment" policy of requiring parties, under certain circumstances, to exhaust their grievance and arbitration remedies prior to pursuing unfair labor practice charges before the Board); *id.* at 1491 (discussing Board's policy of reviewing deferentially arbitrator's resolution of an unfair labor practice claim). Instead, the Board held in *Collier Electric* that

[i]f the collective-bargaining agreement at least arguably binds the employer to the arbitration provision, the union will be free to seek enforcement of its contractual rights by submitting the unresolved bargaining issues to interest arbitration, and by pursuing a Section 301 suit in court, *without violating* Section 8(b)(3) or Section 8(b)(1)(B) of the Act. 296 N.L.R.B. No. 144, at 10 (emphasis added). The Board's invocation of *United Technologies* and *Collyer Insulated Wire* is thus inconsistent with what it actually held in *Collier Electric.*

18. This is obviously the case if the union first files suit in district court to compel arbitration. Even if the union chooses to pursue arbitration first, however, and even if the arbitrator rules that the dispute is arbitrable, the employer is assured of *de novo* review in the district court on the contractual question of whether it agreed to arbitration. *See AT&T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) ("[T]he question of arbitrability ... is undenia-

peculiarly within the courts', but not the Board's, expertise. *See, e.g., Local Union 1395, International Bhd. of Elec. Workers v. NLRB,* 797 F.2d 1027, 1030 (D.C.Cir. 1986); *cf. Litton Fin. Printing Div. v. NLRB,* — U.S. —, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991) ("Although the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters. 'Arbitrators and courts are still the principal sources of contract interpretation.'") (citation omitted) (quoting *NLRB v. Strong,* 393 U.S. 357, 360–61, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969)).

We hold, in sum, that the Board's *Collier Electric* doctrine is a reasonable interpretation of section 8(b)(1)(B) of the NLRA. It remains to be considered whether the Board properly applied that doctrine in this case.

### III. APPLICATION OF THE *COLLIER ELECTRIC* DOCTRINE

■ West Coast argues that even if the *Collier Electric* doctrine is consistent with the NLRA, the Board erred in applying it to the facts of this case. West Coast emphasizes the written minutes of the June 1984 negotiating session, approved by both union and employers' association, in which Local 206 representative Thompson acknowledged that SMACNA–San Diego "had invoked the 'favored nations clause' of the contract to remove Article X, Section 8." West Coast also stresses the testimony of a West Coast witness before the ALJ that, in May 1986, Thompson again acknowledged that the interest arbitration provision was "out because of the earlier actions of SMACNA." West Coast draws two conclusions from this evidence: it contends, first, that Local 206 has no arguable basis for asserting that West Coast was bound by the interest arbitration clause; it

maintains, second, that Local 206 indisputably bargained in bad faith when, notwithstanding its earlier apparent concessions, it invoked the clause three days before the CBA expired. Either of these contentions, if tenable, would invalidate the Board's reliance on *Collier Electric,* for in that case the Board ruled that either a lack of good-faith basis for a union's claim to interest arbitration or a union's bad-faith bargaining would constitute an unfair labor practice under sections 8(b)(1)(B) and 8(b)(3).[19]

Neither of these West Coast contentions, however, survives inspection. The federal District Court for the Southern District of California has not only determined that Local 206 had an arguable basis for its interest arbitration claim; that court has ruled for Local 206 on the merits, and it has reaffirmed its decision on West Coast's motion for reconsideration. *See Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.,* Civ. No. 86–1723–G, mem. op. (S.D. Cal. Jan. 23, 1991); *Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.,* Civ. No. 86–1723–G, mem. op. (S.D. Cal. Apr. 17, 1991) (denying motion for reconsideration). We cannot say, in light of these decisions, that Local 206's contractual arguments were not arguably meritorious. West Coast's recourse on this issue lies not with this court or with the Board, but with the Ninth Circuit, in which West Coast's appeal from the district court's decisions is pending.

Nor can we accept West Coast's argument that, the Board's contrary determination notwithstanding, the minutes of the June 1984 SMACNA–Local 206 meeting, together with the testimony as to the May 1986 West Coast–Local 206 bargaining session, conclusively establish that Local 206 bargained in bad faith. This contention rests on the assumption that Local 206 either sandbagged West Coast by concealing until the last moment its plan to invoke the interest arbitration clause or else as-

bly an issue for judicial determination"; the district court may not defer to an arbitrator's ruling concerning arbitrability unless (as they did not here) "the parties clearly and unmistakably provide otherwise.").

**19.** *See* International Bhd. of Elec. Workers, Local Union No. 46, 302 N.L.R.B. No. 39, at 11–13

(finding union violation under *Collier Electric* because union bargained in bad faith before submitting dispute to interest arbitration); Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 301 N.L.R.B. No. 32, at 13–15 (finding union violation because interest arbitration provision not arguably applicable to employer).

serted a contractual position it at least should have known was unjustified. No evidence, however, was introduced to demonstrate that Local 206 did not simply reevaluate with care the applicability of interest arbitration, and we have already concluded, on the basis of the California district court's decision, that the union's ultimate position was at least arguably justified. The Board was thus within its discretion in concluding that the General Counsel had not met his burden of showing either that Local 206 sandbagged West Coast or that the union should have known its claim was unjustified. Accordingly, the Board reasonably declined to find that Local 206 had violated section 8(b)(3) by bargaining in bad faith.

## IV. CONCLUSION

We hold that the Board's *Collier Electric* doctrine is consistent with the National Labor Relations Act, and that the Board properly relied on that doctrine in dismissing the West Coast complaint.[20] The petition for review is therefore

*Denied.*

---

**20.** We have duly considered and found insubstantial all other objections raised.