**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 6, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BRENT ELECTRIC COMPANY,
INC.,

    Plaintiff Counter Defendant -
Appellant,

v.

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS
LOCAL UNION NO. 584,

    Defendant Counter Plaintiff -
Appellee.

------------------------------

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS;
NATIONAL ELECTRICAL
CONTRACTORS ASSOCIATION,

    Amici Curiae.

No. 23-5108

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CV-00246-CRK-CDL)**

_____

Michael D. Oesterle, King & Ballow, Nashville, Tennessee (Mark E. Hunt and
Marykate E. Williams, King & Ballow, Nashville, Tennessee, and Kevin P.
Doyle, and Alex R. Telarik, Pray Walker, P.C., Tulsa, Oklahoma, with him on
the briefs), for Plaintiff Counter Defendant-Appellant.

Glenda L. Pittman, Glenda Pittman & Associates, P.C., Austin, Texas (Frank W. Frasier, Frasier, Frasier & Hickman, LLP, Tulsa, Oklahoma, with her on the brief), for Defendant Counter Plaintiff-Appellee.

Robert D. Kurnick, Sherman Dunn, P.C., Washington, D.C., filed an Amici Brief for the National Electrical Contractors Association and the International Brotherhood of Electrical Workers, in support of Defendant Counter Plaintiff-Appellee.

_____

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Brent Electric Company appeals the district court's enforcement of an arbitration award that imposed on Brent a renewed three-year collective-bargaining agreement (CBA) with Local Union No. 584 of the International Brotherhood of Electrical Workers (the Union). Brent objects that the imposed CBA contains permissive subjects of bargaining, arguing that it did not clearly and unmistakably waive its purported statutory right to refuse the imposition of permissive subjects, and that such an award violates public policy.

This dispute requires us to consider two separate lines of cases carrying ostensibly contradictory standards: those applying the presumption of arbitrability absent forceful evidence of an intent not to arbitrate; and those requiring a party's clear and unmistakable waiver of a statutory right.

We reject Brent's invitation to confuse the two and agree with the Union that, by agreeing to the interest-arbitration clause in the 2018 CBA, Brent consented to submit both permissive and mandatory subjects of bargaining to

2

arbitration if the parties could not agree on the terms of a new CBA. We therefore affirm the district court and hold Brent to its contractual obligations.[1]

## BACKGROUND

### I.    Factual Background

Brent and the Union have a long-standing relationship dating back to 1996, when Brent signed a Letter of Assent authorizing the Eastern Oklahoma Chapter of the National Electrical Contractors Association (NECA) to negotiate with the Union on Brent's behalf. During the times relevant to this dispute, the Union's relationship with Brent was enabled by Section 8(f) of the Labor-Management Relations Act, which exempts employers in the building and construction industry from the general prohibition on making an agreement with a union before a union has majority-employee support.[2] *See* 29 U.S.C. §§ 158(f), 159(a); *Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 2 v. McElroy's, Inc.* (*McElroy's*), 500 F.3d 1093, 1097 (10th Cir. 2007) ("Section 8(f) thus creates an exception to the NLRA's general rule prohibiting a union

---

[1] We grant the motion submitted by the National Electrical Contractors Association and the International Brotherhood of Electrical Workers for leave to file an amicus brief, which this court provisionally granted on December 29, 2023.

[2] In supplemental briefing, the Union informed us that "[o]n September 23, 2021, the NLRB certified Local 584 as the exclusive collective bargaining representative selected by a majority of Brent's bargaining unit employees" and so "[t]he parties' bargaining relationship now is one governed by Section 9(a) of the Labor Management Relations Act (LMRA)." Appellee Suppl. Br. at 5.

3

and an employer from signing a collective bargaining agreement recognizing the union as the exclusive bargaining representative before a majority of employees have authorized the union to represent their interests.").

During early 2018, NECA and the Union negotiated and agreed to the CBA at issue, which was effective from June 1, 2018, through May 31, 2021 (the 2018 CBA). Relevant to this appeal, the 2018 CBA included an interest-arbitration clause, Section 1.02(d), which was the same as the interest-arbitration clause included in the 2015 CBA:

> Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the [CIR] for adjudication. Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the [CIR] following the expiration date of this agreement or any subsequent anniversary date. The [CIR's] decisions shall be final and binding.

App. vol. I, at 48.

The negotiations also resulted in a memorandum of understanding (MOU) between the Union, NECA, and another electrical contractor, which detailed Brent's obligations to contribute to the Union pension plan. The 2018 CBA incorporated the MOU as Addendum Four.[3] *See* App. vol. I, at 46 (listing Addendum Four in the 2018 CBA's table of contents); *Brent Elec. Co., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 584*, No. 21-CV-00246, 2022 WL

---

[3] Brent disputes that the 2018 CBA incorporated Addendum Four.

16973249, at *5 n.9 (N.D. Okla. Nov. 16, 2022) ("The provisions at Addendum Four were no less a part of the 2018 CBA, despite being an addendum . . . .").

In September 2020, Brent wrote to NECA and the Union to provide notice of its termination and revocation of the Letter of Assent, including its authorization for NECA to act as its bargaining representative for matters related to the CBA. Two months later, Brent provided notice to NECA and the Union of its intent to stop making contributions to the Union pension fund under the MOU.

In February 2021, the Union responded by submitting a grievance to NECA's Labor Management Committee (LMC), claiming that Brent had violated Addendum Four of the CBA. The LMC agreed with the Union, ruling that Brent was "in violation of Addendum 4 of the CBA" and asking Brent to "correct December contribution monies . . . and any subsequent payments going forward." App. vol. I, at 114. In a still-pending related action, the Union filed a complaint in the Northern District of Oklahoma against Brent, asking the court to confirm and enforce the LMC decision, and Brent filed counterclaims.

Also in February 2021, Brent wrote to the Union, expressing its purported "desire[] to reach a prompt successor Agreement with the Union." App. vol. II, at 118. But in the letter, Brent listed twenty-one "Articles/Sections from the expiring" 2018 CBA that it asserted were "permissive subjects of bargaining under established federal labor law" and thus beyond the Union's authority to "lawfully insist" be included in the 2021 CBA. *Id.* at 119. It also

asserted that those subjects could not be imposed through interest arbitration. Among the objected-to sections were Section 1.02(c), the evergreen clause,[4] and Section 1.02(d), the interest-arbitration clause. On that basis, Brent omitted the sections from its proposed agreement. Brent also listed three sections it asserted were "illegal subjects of bargaining," and it likewise omitted them from its proposed CBA. *Id.* Brent did not assert that the interest-arbitration clause was an illegal subject of bargaining.

On April 9, 2021, the Union sent a letter to Brent stating its intent to submit to the arbitrator, the Council on Industrial Relations for the Electrical Contracting Industry (CIR), "unresolved issues that remain between the parties" in accordance with the interest-arbitration clause in Section 1.02(d) of the 2018 CBA. *Id.* at 144. This was a unilateral submission and made over Brent's objection.

In May 2021, before the 2018 CBA expired, the CIR issued its preliminary decision, which included a new CBA. The CIR directed the parties "to sign and implement immediately the inside agreement which is attached hereto and hereby made a part of this decision." *Id.* at 195. Brent wrote to the CIR, objecting to the inclusion of what it asserted were permissive subjects of bargaining, including the evergreen clause. It also objected to the inclusion of

---

[4] The evergreen clause provides that "[t]he existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes." App. vol. I, at 48.

the MOU on pension contributions as Addendum Four. Brent did not object to the 2021 CBA's new arbitration provision.

The next month, the CIR issued a second decision, including a revised version of the CBA, which corrected only "a clerical error" and provided Brent no relief for "the numerous errors and omissions" Brent had raised in its May objection letter. App. vol. I, at 21. The CIR responded to Brent's letter, "not[ing] that Brent Electric's letter of May 30, 2021, requests the deletion of several other provisions, which that letter describes as permissive subjects of bargaining." App. vol. III, at 211. It explained: "Those provisions have not been deleted for two reasons: 1) In each case, they are among the '[u]nresolved issues or disputes' that your company explicitly agreed to submit to arbitration, and 2) the CIR does not agree that those provisions are permissive subjects of bargaining." *Id.* The CIR then imposed its award—the 2021 CBA.

The 2021 CBA contained a different interest-arbitration provision than the 2018 CBA. The 2021 version required mutual agreement before any future interest arbitration could be submitted to the CIR and removed the unilateral provision included in the 2018 CBA's interest-arbitration clause:

> (d). In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the [CIR], either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this

7

Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e). *By mutual agreement only*, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly, with the Union, submit the unresolved issues to the [CIR] for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the [CIR] following the expiration date of this Agreement or any subsequent anniversary date. The [CIR's] decisions shall be final and binding.

App. vol. IV, at 272–73 (emphasis added).

## II.    Procedural Background

In June 2021, Brent filed a complaint in federal district court seeking to vacate and set aside the CIR award. In response to Brent's July 2021 amended complaint, the Union counterclaimed to enforce the award. Besides requesting confirmation of the award, the Union sought an audit of Brent's payroll records, as well as an award for the Union's attorneys' fees and costs.

On November 16, 2022, the district court granted the Union's motion to dismiss Brent's amended complaint. *See Brent Electric*, 2022 WL 16973249, at *6. The parties then cross-moved for summary judgment on the Union's counterclaim for enforcement. The district court partially granted the Union's motion for summary judgment on its counterclaim for enforcement: it confirmed the CIR award but denied the Union's requests for an audit of Brent's business records and an award of attorneys' fees. *Brent Elec. Co., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 584*, No. 21-CV-00246, 2023 WL 5750484, at *11 (N.D. Okla. Sept. 6, 2023). But it ordered Brent to preserve its

8

"payroll-related business records for work performed from June 1, 2021, through the pendency of any appeal taken from this Court's decision." *Id.* The district court denied Brent's motion for summary judgment.

On October 4, 2023, Brent filed a notice of appeal from both the dismissal of its complaint and the denial of its motion for summary judgment. Brent moved to stay enforcement of the 2021 CBA pending this appeal, which the district court denied. *See Brent Elec. Co., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 584*, No. 21-CV-00246, 2024 WL 66039, at *1, *7 (N.D. Okla. Jan. 5, 2024). The district court later reaffirmed its decision and reasoned that any harm Brent might suffer from the imposition of the 2021 CBA was not irreparable and that the public interest favored denial of a stay. *Id.* at *5–6. Brent then moved to stay enforcement of the award in this court under Federal Rule of Appellate Procedure 8(a)(2), which we also denied.

We exercise jurisdiction over the district court's disposition of the motion to dismiss and the cross-motions for summary judgment under 28 U.S.C. § 1291.

## DISCUSSION

We review de novo "the district court's dismissal for failure to state a claim and the district court's grant of summary judgment, applying the same legal standard as the district court." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1106–07 (10th Cir. 2005); *see also United Steel, Paper & Forestry, Rubber, Mnfg., Energy, Allied Indus. & Serv. Workers Int'l Union*

9

*Loc. 13–857 v. Phillips 66 Co.* (*Phillips 66*), 839 F.3d 1198, 1204 (10th Cir. 2016) ("We review de novo the grant of summary judgment, including where the district court has ordered arbitration . . . .").

Brent appeals the district court's dismissal of its complaint and its grant of the Union's motion for summary judgment on its counterclaim to enforce the CIR award. As a preliminary matter, we reject the Union's argument that this case might be moot given Brent's compliance with the 2021 CBA.[5] We next review the legal framework necessary to put Brent's arguments in context. Turning to the merits, we conclude that the presumption of arbitrability applies to Brent's dispute, and reject Brent's arguments that it has a statutory right to avoid having permissive subjects of bargaining imposed in interest arbitration and that such an imposition violates public policy or the Federal Arbitration Act.

## I.    Brent's appeal is not moot.

Article III of the Constitution limits our exercise of "judicial Power" to "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of constitutional mootness means that "the suit must present a real and substantial controversy with respect to which relief may be fashioned" and relevant here, "the controversy must remain alive at the . . . appellate stages of the litigation." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (quoting *Fletcher v.*

---

[5] The 2021 CBA was set to expire at the end of May 2024, shortly after we heard oral argument in this case.

10

*United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)). Constitutional mootness is therefore "grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief.*" *Id.* (cleaned up). "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010) (citation omitted).

Voluntary cessation of challenged activity may moot litigation "if two conditions are satisfied: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 1115 (cleaned up). The party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* at 1116 (cleaned up).

If a party requests only declaratory or injunctive relief, courts may also dismiss a case under the "prudential-mootness doctrine." *Id.* at 1121; *see id.* at 1122 ("This doctrine generally applies only to requests for injunctive or declaratory relief." (citations omitted)). Courts may dismiss a case because of prudential mootness if it "is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Id.* at 1121 (quoting *Fletcher*, 116 F.3d at 1321 (emphasis omitted)). Prudential mootness thus

"arises out of the court's general discretion in formulating prospective equitable remedies" and is particularly appropriate when a party requests injunctive relief against the government. *Bldg. & Const. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993). Under both the constitutional- and prudential-mootness doctrines, "the central inquiry is essentially the same: have circumstances changed since the beginning of the litigation that forestall any occasion for meaningful relief." *Rio Grande Silvery Minnow*, 601 F.3d at 1122 (quoting *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997)).

Though the Union's motion to cancel oral argument on mootness grounds was untimely, we still must consider the Union's arguments because Article III mootness is a jurisdictional issue.[6] *See Rivera v. Bank of Am., N.A.*, 993 F.3d

---

[6] In April 2024, the Union moved to cancel oral argument because it wanted to "bring to the Court's attention this matter's potential, imminent mootness." Mot. to Cancel at 2. It argued that "potential mootness arises from the approaching May 31, 2024 expiration date of the collective bargaining agreement at issue in this matter" and from Brent's "apparent compliance with that agreement," which the Union noted in its opposition to Brent's motion to stay enforcement of the award. *Id.* But in the Union's response to the motion to stay, the Union noted only that "Brent has been complying with most, if not all, of the 2021 CBA's terms." Mot. to Stay Resp. at 17. If the Union believed in January when it responded to Brent's motion to stay that Brent had complied with all the 2021 CBA's terms, it should have moved to cancel due to mootness in January and not waited until April, soon before oral argument. Indeed, under Local Rule 27.3, "a motion for summary disposition because of . . . mootness," 10th Cir. R. 27.3(A)(1)(b), must be filed "within 14 days after the notice of appeal is filed, unless good cause is shown," 10th Cir. R. 27.3(A)(3)(a). The Union has known the date of the 2021 CBA's expiration since early 2021. It therefore lacks good cause in delaying its motion beyond the time that it discovered Brent's compliance with the 2021 CBA, whether that was in January 2024 or earlier.

1046, 1049 n.3 (8th Cir. 2021) ("[M]ootness goes to the very heart of Article III jurisdiction, and any party can raise it at any time. Indeed, it would be the Court's duty to raise and decide the issue on its own motion, if facts suggesting mootness should come to its attention . . . ." (quoting *In re Smith*, 921 F.2d 136, 138 (8th Cir. 1990)). Because "mootness, if it exists, would destroy our jurisdiction, we should address this issue first." *In re Smith*, 921 F.2d at 138.

### A.    Brent did not voluntarily comply with the 2021 CBA, and so its compliance does not moot this appeal.

The Union argues that Brent's compliance with the 2021 CBA moots this appeal. "The test of whether an appeal is moot is whether the party acted voluntarily or because of the actual or implied compulsion of judicial power." *Out of Line Sports, Inc. v. Rollerblade, Inc.*, 213 F.3d 500, 502 (10th Cir. 2000). "Showing that the party's compliance was a consciously performed voluntary act requires more than simple compliance with a court order or decree." *Id.* (citation omitted). In *Out of Line Sports*, a party complied voluntarily with an order enforcing a lien by jointly signing a motion to release the funds, by not moving to stay the judgment, and by not explicitly reserving its right to appeal. *Id.*

In its denial of Brent's motion to stay, the district court noted that "[t]he circumstances of this case are dissimilar from those cases where compliance with a judgment moots an appeal." *Brent Electric*, 2024 WL 66039, at *5 n.3 (citing *Out of Line Sports*, 213 F.3d at 503). We agree. Unlike the compliant

13

party in *Out of Line Sports*, Brent filed a motion to stay enforcement of the CIR award in district court, and when that motion was denied, it filed a motion to stay in this court. Brent has vigorously preserved its objections to the 2021 CBA at all stages of the litigation. And, unlike the party in *Out of Line Sports*, which had jointly moved for the release of funds, Brent refused to sign the 2021 CBA until the district court forced it to do so, fearing that signing it might indicate voluntary compliance. Brent's filing of a complaint in district court to vacate the CIR award, its later motion to stay enforcement, and its appeal suffice to demonstrate that any compliance was involuntary.

Typically, the "party asserting mootness" bears the burden of showing that "the challenged conduct cannot reasonably be expected to start up again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (citation omitted). But here, we need not determine whether "the allegedly wrongful behavior could not reasonably be expected to recur" because that test applies only when a defendant *voluntarily* complies with a request for prospective relief and then challenges the relief on mootness grounds. *Unified Sch. Dist. No. 259 v. Disability Rts. Ctr. of Kansas*, 491 F.3d 1143, 1149 (10th Cir. 2007) (cleaned up). Brent's involuntary compliance makes the recurring-conduct test a poor fit for this case. And it is the Union that is raising a mootness challenge, not Brent, so the Union's assertion that Brent's compliance is voluntary rings hollow. But even if the Union were correct that Brent voluntarily complied with the 2021 CBA, its mootness challenge would still fail because, if successful in

14

this appeal, Brent could seek remedies that would have real-world consequences. We address those consequences next.

> **B.     Brent could seek monetary damages or reimbursements if we decide this appeal in Brent's favor.**

Though this appeal comes too late to affect Brent's compliance with the 2021 CBA, Brent may still try to recover reimbursements or monetary damages stemming from its compliance if we rule in its favor and invalidate the CIR award. If we invalidate the 2021 CBA, Brent could claim reimbursement of a $750 premium for a surety bond, plus interest. Brent could also seek reimbursement of around $5,156.48 in contributions it has made to the Labor-Management Cooperation Committee (LMCC) and National Labor Management Cooperation Committee (NLMCC) funds "pursuant to unlawfully imposed permissive provisions" in the 2021 CBA. Appellant Suppl. Br. at 5.

The Union counters that any "purported, potential damages or other harm do not constitute live controversies." Appellee Suppl. Br. at 9. The Union argues that the surety-bond provision in the 2021 CBA is a mandatory subject of bargaining, and so "any effort Brent makes to seek reimbursement for premiums would subject it to the NLRB's enforcement authority." *Id.*; *see id.* at 6 (citing *Scapino Steel Erectors, Inc.*, 337 NLRB 992, 993–94 (2002)). Second, the Union argues that Brent's claims to a refund for contributions it made to the LMCC and NLMCC do not refute its mootness argument, because "these funds

are not parties to this lawsuit, so there is no federal court jurisdiction in this matter over either of them." *Id.* at 9.

But all of Brent's avenues for potential relief depend on the outcome of this appeal, meaning our decision carries real-world consequences. True enough, Brent may have to initiate an NLRB proceeding to vindicate its right to a remedy under any of the 2021 CBA's mandatory provisions, but it may only do so if we invalidate the CBA. Likewise, Brent's ability to proceed against LMCC and NLMCC for reimbursement of its contributions hinges on our decision here.

The Union adds that "if separately sued by Brent, both [the LMCC and NLMCC] may be able to successfully defend." *Id.* According to the Union, these committees could defend against such an action because "Brent has adopted the 2021 CBA by its conduct, and is as bound as it would have been had it signed that CBA at its inception." *Id.* at 5. Further, the Union argues, the liquidated-damages and interest provisions attached to contributions to those committees' funds are "triggered only by a delinquency in contributions, and Brent has identified no such delinquency arising under the 2021 CBA." *Id.* at 9–10.

None of these uncertainties—regarding the forum before which any remand proceedings may occur, the likelihood of success of such proceedings, or what the most appropriate remedy would be—affect our jurisdiction over this appeal. *See Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 202 (1991)

("We have accorded the Board considerable authority to structure its remedial orders to effect the purposes of the NLRA and to order the relief it deems appropriate."). If we decide in Brent's favor, then Brent may seek such relief and initiate those proceedings; without such a decision, Brent may not. This is enough of a real-world consequence to persuade us that Brent's appeal is not moot. *See Rio Grande Silvery Minnow*, 601 F.3d at 1110.

**C.    We decline to exercise our discretion to dismiss the appeal under the prudential-mootness doctrine.**

Finally, the Union invites us to dismiss this case under the prudential-mootness doctrine because the relief sought here is "arguably" "declaratory in nature," Appellee Suppl. Br. at 2, and urges us to decide "whether granting a *present* determination of the issues offered will have some effect in the real world," *id.* (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1110). Having decided that we have Article III jurisdiction, we choose not to dismiss this case under the prudential-mootness doctrine for two main reasons: First, Brent does not seek injunctive relief against the government, so considerations of comity are inapposite. Second, Brent's request for relief, though framed in declaratory or injunctive terms, still has real-world consequences—a decision in its favor would result in remand proceedings in which Brent could claim monetary damages, or at least reimbursement, as discussed above. *See Rio Grande Silvery Minnow*, 601 F.3d at 1110.

For these reasons, we retain jurisdiction over this appeal.

17

## II.    Legal Framework

We start with a brief survey of three interrelated topics that are implicated in this appeal: the presumption of arbitrability, interest-arbitration clauses, and the distinction between mandatory and permissive subjects of bargaining.

### A.    The Presumption of Arbitrability

In a set of three cases referred to as the "Steelworkers trilogy," the Supreme Court articulated a framework by which to determine whether a collective-bargaining dispute is arbitrable. *See generally United Steelworkers of Am. v. Enter. Wheel & Car Corp.* (*Enterprise Wheel*), 363 U.S. 593 (1960); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.* (*Warrior & Gulf*), 363 U.S. 574 (1960); *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960). The Court has summarized four main principles from the Steelworkers trilogy. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–50 (1986). First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 648 (quoting *Warrior & Gulf*, 363 U.S. at 582); *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting same). Second, the "question of arbitrability" is "an issue for judicial determination." *AT&T*, 475 U.S. at 649. That is, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* (citing *Warrior & Gulf*, 363 U.S. at 582–83). Third, "in

18

deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* at 649; *see id.* at 650 ("[C]ourts . . . have no business weighing the merits of the grievance . . . or determining whether there is particular language in the written instrument which will support the claim." (quoting *Am. Mfg. Co.*, 363 U.S. at 568)). Fourth, and most importantly here, "where the contract contains an arbitration clause, there is a presumption of arbitrability." *Id.* at 650. This means that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* (quoting *Warrior & Gulf*, 363 U.S. at 582–83).

The presumption of arbitrability arises from "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration." *Warrior & Gulf*, 363 U.S. at 582. This is because, in the labor context, "arbitration is the substitute for industrial strife." *Id.* at 578; *see* 29 U.S.C. § 151 (recognizing that "[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest" and declaring "the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce"). The presumption of arbitrability thus "reconciles the principle that a party cannot be

19

required to submit to arbitration any dispute that he has not agreed so to submit, with the federal policy and presumption favoring arbitration in the labor context." *Int'l Bhd. of Elec. Workers, Loc. No. 111 v. Pub. Serv. Co. of Colorado*, 773 F.3d 1100, 1108 (10th Cir. 2014) (cleaned up).

But the presumption applies where "arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to an arbitrator) is legally enforceable and best construed to encompass the dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010). So, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

The Court directs us to apply the following framework to determine whether the presumption applies and, if it does, whether it is rebutted:

> [E]xcept where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter. [Courts] then discharge this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted.

*Granite Rock*, 561 U.S. at 301 (cleaned up).

And so, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." *Warrior & Gulf*, 363 U.S. at 584–85; *see Phillips 66*, 839 F.3d at 1204 (quoting same).

A challenge to the scope of an interest-arbitration clause is therefore construed as an arbitrability issue because it challenges whether a particular dispute was rightly before an arbitrator—it does not challenge the arbitration agreement's existence. *See Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement.").

### B.    Interest-arbitration Clauses

CBAs often include what courts have called "interest arbitration clause[s]" or provisions. *Sheet Metal Workers' Int'l Ass'n, Loc. 14 v. Aldrich Air Conditioning, Inc.* (*Aldrich Air Conditioning*), 717 F.2d 456, 456 (8th Cir. 1983). Interest-arbitration clauses usually function by allowing one party to submit unresolved disputes to arbitration if negotiations for a renewed agreement stall or are unproductive. *See id.* ("An interest arbitration clause is one in which the parties agree to arbitrate disputes over the terms of a new collective bargaining agreement in the event of deadlock."). The resulting

21

arbitration then leads to the imposition of a set of "new contract terms." *McElroy's*, 500 F.3d at 1095 n.1.

Interest-arbitration clauses are often paired with so-called "extension clauses" or "evergreen clauses," which, when combined, provide for the continuation of a current agreement until a successor agreement is reached, either by mutual agreement or by arbitration, unless both parties agree to terminate. *Id.* at 1098 ("Read together, these articles provide two options upon the expiration of the agreement: automatic renewal" or "negotiation of a renewal agreement." But if "the parties fail to negotiate a renewal of the agreement . . . either party may submit the dispute to the [arbitrator] for arbitration. While the dispute is pending resolution before the [arbitrator], [the extension clause] prevents the original agreement from expiring." (cleaned up)).

### C.   Mandatory and Permissive Subjects of Bargaining

The distinction between mandatory and permissive subjects of bargaining stems from the National Labor Relations (Wagner) Act of 1935 (NLRA), 29 U.S.C. §§ 151–169. As amended by the Labor-Management Relations (Taft-Hartley) Act of 1947 (LMRA), Pub. L. No. 80–101, 61 Stat. 136, Section 8 of the NLRA outlines both employers' and labor organizations' "[o]bligation[s] to bargain collectively" "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); *see id.* § 158(a)(5) (making it an unfair labor practice for employers to refuse to bargain collectively); *id.*

§ 158(b)(3) (same for labor organizations). The Court refers to "wages, hours, and other terms and conditions of employment," *id.* § 158(d), as "subjects for mandatory bargaining," *Allied Chem. & Alkali Workers of Am., Loc. Union No. 1 v. Pittsburgh Plate Glass Co.* (*Allied Chemical*), 404 U.S. 157, 178 (1971). By contrast, nonmandatory or "permissive subjects cover[] all other areas." *Facet Enters., Inc. v. N.L.R.B.*, 907 F.2d 963, 975 (10th Cir. 1990). So, "[a]lthough parties are free to bargain about any legal subject, Congress has limited the mandate or duty to bargain to matters of 'wages, hours, and other terms and conditions of employment.'" *First Nat. Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 674 (1981) (quoting 29 U.S.C. § 158(d)). This means that "parties to labor negotiations are not obligated to negotiate over permissive bargaining subjects." *Facet Enterprises*, 907 F.2d at 975.

To enforce the duty to bargain collectively over mandatory subjects, Section 8(a)(5) makes an employer's "refus[al] to bargain collectively with the representatives of his employees" an unfair labor practice, § 158(a)(5), while Section 8(b)(3) makes a labor organization liable for the same behavior, *id.* § 158(b)(3). When agreement about mandatory subjects is conditioned upon agreement about permissive subjects of bargaining, such insistence is "in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." *N.L.R.B. v. Wooster Div. of Borg-Warner Corp.* (*Borg-Warner*), 356 U.S. 342, 349 (1958). And such a refusal constitutes an unfair labor practice for labor organizations as well as employers. *See N.L.R.B. v.*

23

*Bartlett-Collins Co.*, 639 F.2d 652, 655 (10th Cir. 1981) ("The Court specifically stated in *Borg-Warner* that good faith does not entitle a party to insist upon nonmandatory subjects as a precondition to agreement."); *Newspaper Printing Corp. v. N.L.R.B.*, 625 F.2d 956, 963 (10th Cir. 1980) ("[I]t is equally well established that insistence to impasse upon a non-mandatory subject of bargaining violates § 8(a)(5).").

In practice, the distinction means that if an impasse is reached after good-faith bargaining over *mandatory* subjects, the other party may lawfully take unilateral action to resolve the impasse.[7] *See Aggregate Indus. v. N.L.R.B.*, 824 F.3d 1095, 1099 (D.C. Cir. 2016) ("If the union refused to bargain, or if negotiations reached an impasse, then the company could make the change unilaterally."). By contrast, "[a] unilateral change to a permissive subject of bargaining is illegal" so that "if negotiations stall, the company has no choice but to maintain the status quo." *Id.*

In conclusion, "[t]he duty [to bargain in good faith] is limited to [wages, hours, and other terms and conditions of employment], and within that area neither party is legally obligated to yield. As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree." *Borg-*

---

[7] "An impasse exists when parties to a labor negotiation exhaust all possibility of reaching an agreement and further negotiations would be fruitless. Once a valid impasse is reached, an employer may take reasonable unilateral action without violating the [NLRA]." *Facet Enterprises*, 907 F.2d at 975 n.9 (10th Cir. 1990) (citations omitted).

*Warner*, 356 U.S. at 349 (citation omitted). Importantly, for nonmandatory or permissive provisions, "[e]ach would be enforceable if agreed to by the unions." *Id.*

With that background in mind, we proceed to the merits.

### III. The presumption of arbitrability applies because the interest-arbitration clause was validly formed and covers the dispute.

Applying the Court's directive in *Granite Rock*, we note first that neither party contests that it is the court's duty to interpret the 2018 CBA and to determine whether the parties intended to arbitrate permissive subjects of bargaining. *See* 561 U.S. at 301 ("[E]xcept where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter." (cleaned up)); *Dumais*, 299 F.3d at 1220 ("The presumption in favor of arbitration . . . disappears when the parties dispute the existence of a valid arbitration agreement."). We also note that Brent does not challenge the validity of the 2018 CBA as a whole, or contest that it agreed to the interest-arbitration clause in Section 1.02(d). *See Brent*, 2023 WL 5750484, at *4 (stating that it is "undisputed that the parties agreed to the 2018 CBA" and that the 2018 CBA includes Section 1.02(d)); Op. Br. at 5 ("During early 2018, NECA and the Union negotiated and entered into a multi-employer collective bargaining agreement . . . [including] Section 1.02(d)."); Resp. Br. at 16 ("Brent does not dispute that it validly entered into the 2018 CBA, including

25

its Section 1.02(d), an interest arbitration provision authorizing the CIR to adjudicate unresolved bargaining issues.").[8]

Brent argues instead that it did not intend by its agreement to the 2018 CBA and Section 1.02(d) to submit permissive subjects of bargaining to arbitration. So by challenging the scope of the interest-arbitration clause and asserting that it does not cover permissive subjects of bargaining, Brent raises an arbitrability issue. *See McElroy's*, 500 F.3d at 1096 (stating that the "ultimate question thus posed is whether the agreement bound McElroy's to engage in interest arbitration" and construing that question as a "question of arbitrability" for the court to decide (citation omitted)).

We therefore conclude that, because the arbitration clause was validly formed, the presumption of arbitrability applies unless the arbitration clause does not "encompass the dispute." *Granite Rock*, 561 U.S. at 303. To make that determination, we turn next to the application of *Granite Rock*'s enumerated steps: first, we determine whether the interest-arbitration clause in the 2018 CBA unambiguously covers permissive subjects of bargaining; and second, if any ambiguity exists, we discuss whether Brent rebutted the presumption of arbitrability here.

---

[8] Brent's objections relate to the CIR proceedings in 2021 and the 2021 CBA—Brent does not identify any objections it made to the 2018 CBA or the 2018 CBA's interest-arbitration clause.

26

### A.    The interest-arbitration clause unambiguously covers all subjects in the 2018 CBA, including permissive subjects.

As an initial matter, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[9] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1246 (10th Cir. 2018) (quoting same). CBAs are also interpreted "according to ordinary principles of contract law." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). Because the signatories to the 2018 CBA are based in Oklahoma and the work was performed there, we determine that Oklahoma law applies to the interpretation of the 2018 CBA's terms. *See* Okla. Stat. Ann. tit. 15, § 162 ("A contract is to be interpreted according to the law and usage of the place where it is to be

---

[9] The Court qualified this rule by noting that "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T*, 475 U.S. at 649). It explained: "In this manner the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption." *Id.* at 944–45.

But the "clear and unmistakable" standard does not apply here, because, as discussed above, the parties do not dispute that the scope of the interest-arbitration clause was properly submitted to the court, not the arbitrator.

27

performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.").[10]

Under Oklahoma contract law, "[i]f the terms of a contract are unambiguous, clear and consistent, they are accepted in their plain and ordinary sense and the contract will be enforced to carry out the intention of the parties as it existed at the time it was negotiated." *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007). "Unless some technical term is used in a manner meant to convey a specific technical concept, language in a contract is given its plain and ordinary meaning." *K & K Food Servs., Inc. v. S & H, Inc.*, 3 P.3d 705, 708 (Okla. 2000); *see also Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 (Okla. 2003) ("If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting." (footnotes omitted)). Further, "[c]ontractual intent is determined from the entire agreement." *Whitehorse*, 156 P.3d at 47.

With these state-law contract principles in mind, we examine the interest-arbitration clause at issue. Section 1.02(d) of the 2018 CBA reads:

> Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the [CIR] may be submitted jointly or unilaterally to the [CIR] for adjudication. Such unresolved issues or disputes shall be submitted no later than

---

[10] "Oklahoma statutes provide a comprehensive scheme which governs contractual agreements." *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 n.16 (Okla. 2003).

28

the next regular meeting of the [CIR] following the expiration date of this agreement or any subsequent anniversary date. The [CIR's] decisions shall be final and binding.

App. vol. I, at 48. The key language of this clause is in the first sentence: "Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement . . . ." *Id.* We discern that this is a "broad" arbitration clause, *see Warrior & Gulf*, 363 U.S. at 585, because the terms "[u]nresolved issues or disputes" are limited only by the qualification that they "aris[e] out of the failure to negotiate a renewal or modification" of the CBA, App. vol. I, at 48. Section 1.02(d) therefore provides that any disputes arising from the eleven articles (each with several subsections), and five addenda contained in the 2018 CBA may be unilaterally submitted to arbitration. And, according to Brent, those eleven articles and five addenda include both permissive and mandatory subjects of bargaining. *See* App. vol. II, at 118–19 (objecting that twenty-one subsections in the 2018 CBA were permissive subjects and should not be imposed in the 2021 CBA). *But see* App. vol. III, at 211 ("[T]he CIR does not agree that those provisions are permissive subjects of bargaining.").[11]

---

[11] The Union seems to accept Brent's premise that the objected-to provisions in the 2021 CBA were "permissive subjects of bargaining" despite the CIR determining otherwise. *See* Resp. Br. at 10 (quoting CIR Letter). When the CIR responded to Brent's objections to the award, it wrote that "[t]hose provisions have not been deleted for two reasons: 1) In each case, they are among the '[u]nresolved issues or disputes' that your company explicitly

(*footnote continued*)

29

The arbitration clause's breadth does not render it ambiguous. We agree with the district court that the term "'unresolved issues or disputes' is unambiguous." *Brent Electric*, 2023 WL 5750484, at *4 (quoting App. vol. I, at 48). The district court properly consulted a dictionary to confirm its understanding of the plain meaning of that term, noting that the word "[u]nresolved" means "not settled, solved, or brought to resolution," and that the word "[d]isputes" means a "controversy." *Id.* (citations omitted); *see Cherokee Nation v. Lexington Ins. Co.*, 521 P.3d 1261, 1267 (Okla. 2022) ("Our Court has relied on dictionary definitions to provide the common, ordinary usage of terms. A common dictionary is helpful here." (citation omitted)); *see also McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1145 (10th Cir. 2023) ("When determining the plain and ordinary meaning of words, we may consider definitions in a recognized dictionary." (citation omitted)). The district court determined that the "language of § 1.02(d) captures a dispute over any provision arising from the negotiation of a successor agreement to the 2018 CBA." *Brent Electric*, 2023 WL 5750484, at *4. It therefore concluded that the agreement to arbitrate "extends to all subjects of negotiation among the parties

---

agreed to submit to arbitration, and 2) the CIR does not agree that those provisions are permissive subjects of bargaining." App. vol. III, at 211.

Because we are cautioned by the Court not to reach the merits of an arbitral award, we do not question the CIR's determination. *See AT&T*, 475 U.S. at 649 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.").

including those created by contract," and is not limited to mandatory subjects of bargaining. *Id.* at *5.

The district court also properly looked to the surrounding subsections in Article I to conclude that Section 1.02 "refers to the agreement as a whole and does not limit itself to disputes arising from obligations imposed by the NLRA." *Id.*; *see Whitehorse*, 156 P.3d at 47 ("Contractual intent is determined from the entire agreement."); *cf. Marcantel v. Saltman Fam. Tr.*, 993 F.3d 1212, 1235 (10th Cir. 2021) (applying Utah principles of contract interpretation and considering "natural meaning" of words "in context of the contract as a whole"). For example, it noted that Section 1.02(a) "refers to withdrawal from the agreement as a whole," that Section 1.02(b) "speaks of changes to the agreement without distinction between the mandatory and non-mandatory subjects contained within the agreement," and that Section 1.02(f) discusses "terminating the agreement, not parts of the agreement." *Brent Electric*, 2023 WL 5750484, at *5. We see no flaw in the district court's plain-language and contextual analysis and conclude that it tracks state-law principles governing the formation of contracts. That Section 1.02(d) is broadly worded and does not distinguish between mandatory and permissive subjects of bargaining does not make it ambiguous as to either.[12]

---

[12] On appeal, Brent asserts that Section 1.02(d) is "unquestionably ambiguous," and claims that the district court's "act of consulting a source outside of the specific language for its meaning"—i.e., a dictionary—

*(footnote continued)*

Brent disputes the district court's conclusion that Section 1.02(d) contains "no language of limitation" and that such an interpretation would give the CIR "free reign [sic]" to consider and make "award[s] as to any and every permissive subject of bargaining." Op. Br. at 28–29. But any authority that the CIR has—to which Brent now objects—is authority which Brent gave the CIR when it renewed the 2018 CBA, and with it, Section 1.02(d)'s interest-arbitration clause. *See* Discussion § IV(B), *infra*; *McElroy's*, 500 F.3d at 1097 ("Nothing in the NLRA, the NLRB's decisions, or this Court's precedent releases McElroy's from this bargained-for contractual obligation."). Brent argues that Section 1.02(d) "must be construed in light of the 'important goal of national labor policy' to preserve the 'freedom to exclude nonmandatory subjects from labor agreements.'" Op. Br. at 30 (quoting *Sheet Metal Workers Loc. Union No. 54 v. E.F. Etie Sheet Metal Co.* (*E.F. Etie*), 1 F.3d 1464, 1476 (5th Cir. 1993)). But Brent relies on out-of-circuit authority

---

"demonstrates that the language is in fact ambiguous." Op. Br. at 24. Brent argues that the term "unresolved issues or disputes" is ambiguous about whether a party may unilaterally submit to the CIR *both* mandatory and permissive subjects of bargaining, or only mandatory subjects of bargaining. *Id.* But as the Union notes, Brent did not argue below that this provision is ambiguous; rather, it referred to the provision as having a "plain meaning." Resp. Br. at 19 (quoting App. vol. IV, at 501 n.4, 502; App. vol. VIII, at 1222). Because Brent did not present the argument it now makes on appeal—that Section 1.02(d) is ambiguous as to permissive subjects of bargaining—and does not argue for plain-error review, it has waived that argument. *See Ball v. United States*, 967 F.3d 1072, 1078 (10th Cir. 2020) ("Because Plaintiffs failed to preserve their argument below and have not argued for relief under plain-error review, we consider the argument waived.").

for this proposition—*E.F. Etie* is not binding on us. Brent's attempt to shoehorn its public-policy argument into a contract-interpretation argument is unavailing.

### B.   Even if Section 1.02(d) were ambiguous, the presumption in favor of arbitrability would still apply because Brent has not rebutted it with forceful evidence.

Because we conclude that Section 1.02(d) unambiguously covers both permissive and mandatory subjects of bargaining, the presumption of arbitrability arising from a validly formed agreement to arbitrate is not defeated. But even if we agreed with Brent's waived appellate argument that Section 1.02(d) is ambiguous about whether it includes permissive subjects of bargaining, *see supra* n.12, we "adher[e] to the presumption and order[] arbitration" where, as here, "the presumption is not rebutted." *Granite Rock*, 561 U.S. at 301. "To rebut the presumption, the party opposing arbitration must provide 'forceful evidence' that the parties intended to exclude the dispute from arbitration." *Phillips 66*, 839 F.3d at 1204 (quoting *Warrior & Gulf*, 363 U.S. at 584–85). Such "forceful evidence" of an exclusion may come from the CBA itself. *See Loc. 5-857 Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123, 1127 (10th Cir. 2003) (considering and rejecting company's assertion that language in the agreement provided positive assurance that the arbitration clause was not susceptible to an interpretation covering the dispute). Or it may come from "facts beyond the agreement" such as "the terms of an employee medical plan" or "the parties' 'bargaining

33

history.'" *Nat'l Nurses Org. Comm. v. Midwest Div. MMC, LLC*, 70 F.4th 1315, 1327 (10th Cir. 2023) (Rossman, J., dissenting) (first citing *Phillips 66*, 839 F.3d at 1207; and then citing *Loc. 7 United Food & Com. Workers Int'l Union v. Albertson's Inc.*, 963 F.2d 382 at *2 (10th Cir. 1992) (unpublished table decision)); *cf. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Loc. No. 4-2001 v. ExxonMobil Ref. & Supply Co.*, 449 F.3d 616, 620 (5th Cir. 2006) ("[E]vidence of bargaining experience can be introduced only where the contract language is ambiguous as to arbitrability." (emphasis omitted)).

So Brent would need to show "the most forceful evidence of a purpose to exclude [permissive subjects of bargaining] from arbitration." *Phillips 66*, 839 F.3d at 1204 (quoting *Warrior & Gulf*, 363 U.S. at 584–85). Brent does not point to such evidence. Other than Brent's real-time objections to the Union's unilateral submission of the dispute to CIR in the spring of 2021, Brent offers no evidence to refute its intent in the spring of 2018 to submit "[u]nresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement" to arbitration, as memorialized in the 2018 CBA. App. vol. I, at 48. Brent has not attempted to show that the 2018 CBA's terms provide evidence of an intent to exclude permissive subjects of bargaining from interest arbitration, or that any evidence beyond the CBA's four corners, such as the parties' bargaining history, does so. Without such evidence, the district court correctly concluded that, even if Section 1.02(d)

were ambiguous as to permissive subjects of bargaining, the presumption of arbitrability would still apply.

**IV.    Brent asserts no statutory right that allows it to avoid its contractual obligations.**

Brent argues that it has a statutory right to "refuse to bargain over and accept . . . permissive subjects of bargaining" in the 2021 CBA, Op. Br. at 27, and that because the Union can identify no "clear and unmistakable" waiver language in the 2018 CBA, Brent did not waive that statutory right, *id.* at 25–26 (quoting *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693, 708 (1983)).[13] But requiring a waiver in these circumstances would effectively "reverse[] the presumption" that *should* apply. *First Options of Chicago*, 514 U.S. at 945. As described above, the presumption of arbitrability applies in this case and Brent did not present forceful evidence to rebut it. Because the statutory rights Brent would need to assert to prevail in this argument do not exist, and because the statutory rights Brent *does* have were not infringed, we decline to reverse the presumption. Instead, we hold Brent to its contractual agreement to submit unresolved issues to arbitration.

---

[13] We note that the Court also uses the "clear and unmistakable" waiver standard to determine whether parties have agreed to submit the "gateway" issue of arbitrability to an arbitrator—but that is a different situation than here. *See Dish Network*, 900 F.3d at 1243–44 ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." (cleaned up)).

35

**A.    The "clear and unmistakable" waiver standard is inapplicable here.**

Brent's "clear and unmistakable" waiver argument is misplaced because where there is no infringement of a statutory right, no waiver is necessary. In support of its statutory-rights argument, Brent relies on Sections 8(a)(5), 8(b)(3), and 8(d) of the NLRA, 29 U.S.C. § 158, which together make it an unfair labor practice for an employer or labor organization to refuse to bargain collectively and in good faith about mandatory subjects of bargaining. These statutory provisions allow either party to charge the other with an unfair labor practice before the NLRB if that party refuses to bargain over mandatory subjects or insists on or bargains to impasse over permissive subjects. *See* 29 U.S.C. § 160(a) (empowering the NLRB "to prevent any person from engaging in any unfair labor practice" listed in § 158); *Newspaper Printing Corp.*, 625 F.2d at 963 (stating that "it is the Board's duty to make the final determination as to whether an unfair labor practice has occurred" and that "insistence to impasse upon a non-mandatory subject of bargaining violates § 8(a)(5)").

To bring its argument into alignment with the NLRA and caselaw, Brent frames its statutory right as the right to "refuse to bargain over permissive subjects." Reply Br. at 10. But Brent's articulation of that right is deceptive: Brent's asserted right is not as broad as the right it would *need* to assert for its argument to work, which is the purported right to not have permissive subjects

36

of bargaining imposed in arbitration under an interest-arbitration clause to which it agreed.

Brent cites *Edison* in support of its assertion that any "contractual waiver of a protected right must be 'clear and unmistakable.'" Op. Br. at 25 (quoting *Edison*, 460 U.S. at 708); *see also Capitol Steel & Iron Co. v. N.L.R.B.*, 89 F.3d 692, 697 (10th Cir. 1996) ("Waivers of statutory bargaining rights must be 'clear and unmistakable' in order for courts to enforce them." (quoting *Edison*, 460 U.S. at 708)). In *Edison*, the Court reviewed a decision by the NLRB that "the imposition of more severe sanctions on union officials for participating in an unlawful work stoppage violates § 8(a)(3)," meaning that such conduct evinced anti-union discrimination and violated the right to strike. 460 U.S. at 710; *see id.* at 702, 705. Indeed, the right to strike is affirmatively stated in the NLRA. 29 U.S.C. § 163. And anti-union discrimination is prohibited as an unfair labor practice under § 158(a)(3).

The Court recognized that "a union could choose to bargain away this statutory protection to secure gains it considers of more value to its members." *Edison*, 460 U.S. at 707. But any such waiver must be "established clearly and unmistakably." *Id.* at 709. The Court was not convinced by the company's position that "the union's silence manifested a clear acceptance of the earlier arbitration decisions"—which imposed a "higher duty on union officials" than other employees—because the Court did not agree "that two arbitration awards

37

establish a pattern of decisions clear enough to convert the union's silence into binding waiver." *Id.*

We emphasize here that *Edison*'s procedural posture was the review of an NLRB decision: the union had charged the company with an unfair labor practice, and the company asserted waiver (by the union) of the specific statutory right as a defense. *Id.* at 697, 700. This procedural posture is a common scenario for a court's review of clear-and-unmistakable-waiver claims under the NLRA. *See, e.g.*, *Int'l Bhd. of Elec. Workers, Loc. 803 v. N.L.R.B.*, 826 F.2d 1283, 1285, 1287–88 (3d Cir. 1987) (finding clear-and-unmistakable waiver of union's right to strike in general no-strike clause and upholding NLRB's dismissal of union's unfair labor practice claim); *Gen. Motors Corp. v. N.L.R.B.*, 700 F.2d 1083, 1088–91 (6th Cir. 1983) (enforcing NLRB decision holding that company committed an unfair labor practice by withholding time-study data that was "relevant and necessary to the Union's bargaining function" because the CBA was silent on time-study data and so the union did not clearly and unmistakably waive that right).

The Court has since applied *Edison*'s clear-and-unmistakable waiver standard to examine whether a union has waived a judicial forum for its members' individual claims under other statutes, not just the NLRA, by agreeing to arbitration clauses or other alternative-dispute-resolution provisions. *See, e.g.*, *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) (noting that the CBA in a grocery store wages dispute did not clearly and unmistakably

38

waive store clerk's right to bring state-law wage claims in court); *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 72, 80 (1998) (finding that a general arbitration clause did not meet clear-and-unmistakable waiver standard for employee to waive judicial forum for claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009) (holding that CBA's arbitration clause requiring union members to arbitrate claims arising from the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, is enforceable where the waiver is clear and unmistakable).[14]

We and other circuits have continued to apply the clear-and-unmistakable waiver standard to assess a union's waiver of its individual members' statutory rights. *See, e.g.*, *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1205–07 (10th Cir. 2011) (citing *14 Penn Plaza* and *Wright* for "clear and unmistakable" standard and finding that CBA did not explicitly waive judicial forum for employee's Title VII claims even though CBA empowered arbitrator to resolve similar but contract-based anti-discrimination rights); *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222–23 (2d Cir. 2019) (finding

---

[14] *14 Penn Plaza* established a "two-prong test" to determine when a "court may compel arbitration of a plaintiff's federal statutory claim": "(1) the arbitration provision clearly and unmistakably waives the employee's ability to vindicate his or her federal statutory right in court; and (2) the federal statute does not exclude arbitration as an appropriate forum." *Jones v. Does 1-10*, 857 F.3d 508, 512 (3d Cir. 2017) (citing *14 Penn Plaza*, 556 U.S. at 260). ǃ

that CBA's arbitration provision clearly and unmistakably waived judicial forum for home-healthcare worker's Fair Labor Standards Act, 29 U.S.C. §§ 201–219, and state labor-law claims); *Darrington v. Milton Hershey Sch.*, 958 F.3d 188, 191 (3d Cir. 2020) (finding that CBA's arbitration provision clearly and unmistakably waived judicial forum for discrimination claims under Title VII, 42 U.S.C. §§ 2000e–2000e-17, and state anti-discrimination act); *Ibarra v. United Parcel Serv.*, 695 F.3d 354, 357, 359–60 (5th Cir. 2012) (finding that CBA's arbitration provision did not clearly and unmistakably waive judicial forum for Title VII claims and remarking that, "courts have concluded that for a waiver of an employee's right to a judicial forum for statutory discrimination claims to be clear and unmistakable, the CBA must, at the very least, identify the specific statutes the agreement purports to incorporate or include an arbitration clause that explicitly refers to statutory claims"). As the Second Circuit noted, "the [clear and unmistakable] standard ensures that employees' right to bring statutory claims in court is not waived by operation of confusing, 'very general' arbitration clauses." *Abdullayeva*, 928 F.3d at 223 (quoting *Wright*, 525 U.S. at 80).

Understanding the waiver standard's application in these cases helps us see the contrast here. Unlike the plaintiffs in these statutory-claims cases, Brent is not asserting a right under which it *would have* sought a remedy but for its agreement to an overly broad or vague arbitration clause, nor is it challenging the forum in which it would have vindicated such a right. And unlike parties

40

charging an unfair labor practice violation before the NLRB, Brent is not countering a defense of waiver. As far as we can tell, Brent did not bring a statutory claim before the NLRB charging the Union with an unfair labor practice.[15] Nor does Brent claim that the 2018 CBA prevented it from doing so.

In *West Coast Sheet Metal, Inc. v. N.L.R.B.*, the D.C. Circuit grappled with a similar argument: the company in that case argued that the NLRB's

---

[15] Brent insinuated below and implied in its appellate briefing that the Union insisted on or bargained to impasse over permissive subjects. *See* App. vol. I, at 19 ("[N]either party can lawfully insist on the Article/Section being included in a successor [CBA]."); Op. Br. at 21 ("The [NLRB] . . . has ruled that insisting on permissive subjects of bargaining constitutes bad faith and violates the NLRA."); Reply Br. at 10 ("This Court has likewise held that bargaining to impasse over a permissive subject constitutes an unfair labor practice under the NLRA.").

Brent complained in the proceedings below about the Union's uncooperative behavior in 2021—the period between Brent's proposing a new CBA and the Union's referral to the CIR. *See generally* App. vol. II, at 150–57 (Brent's Brief to CIR). Brent told the CIR that the Union was still not "ready to negotiate" in December 2020, three months after Brent notified the Union of its intent to terminate the 2018 CBA. *Id.* at 150. The Union apparently stalled the negotiations, and in March 2021 made it "clear that the Union intended to seek CIR to resolve the negotiations." *Id.* at 151. The parties exchanged some emails with proposed agreements but could not come to an agreement. In April 2021, the Union notified Brent of its intent to unilaterally invoke interest arbitration. The parties eventually met after the Union's invocation of interest arbitration, apparently to little avail. Brent summarized it thus: "[T]he Company believes that the Union's conduct, including its March 25, 2021 letter, demonstrates the Union never intended to negotiate an agreement but rather intended to bypass negotiations and proceed directly to CIR. The Union's conduct makes a sham out of the bargaining process and improperly attempts to make CIR party to its sham bargaining." *Id.* at 155.

But Brent does not directly accuse the Union of insisting on or bargaining to impasse over permissive subjects of bargaining and nothing in the record suggests that Brent charged the Union with an unfair labor practice before the NLRB.

decision "allowed a 'fundamental' statutory right to be relinquished without requiring a showing that it was 'clearly and unmistakably waived.'" 938 F.2d 1356, 1362 (D.C. Cir. 1991). The company had charged the union with an unfair labor practice, alleging that the union's "declaration of a deadlock and submission of the dispute to [arbitration] violated the union's duty under section 8(b)(3) of the NLRA to bargain in good faith, and coerced and restrained [the company] in the selection of its representatives for the purposes of collective bargaining, thus violating section 8(b)(1)(B)." *Id.* at 1359 (cleaned up). The NLRB rejected the company's accusation that the union bargained to impasse on the inclusion of a new interest-arbitration clause and held that a "union does not commit an unfair labor practice by submitting deadlocks to interest arbitration," so long as the interest-arbitration clause arguably covers an employer who has withdrawn from a multi-employer association in the middle of the contract's term, and so long as the union bargained in good faith before submitting unresolved issues to arbitration. *Id.* at 1359–60. The district court enforced the NLRB's decision, and the company appealed. *Id.* at 1360.

Affirming the NLRB's decision in *International Brotherhood of Electrical Workers, Local No. 113* (*Collier Electric*) as a reasonable interpretation of the right in question, the D.C. Circuit rejected the company's framing of its "'fundamental' statutory right." *Id.* at 1362 (citing *Collier Electric*, 296 NLRB 1095, 1097 (1989)). The D.C. Circuit concluded that the purported right "does not bestow upon an employer, who has withdrawn

midterm from a multiemployer association, any right to be free from a union's invocation, after bargaining in good faith to impasse, of an at least arguably applicable interest arbitration provision." *Id.* The D.C. Circuit determined that *Collier Electric* "in effect decided that the employer's right at issue is not so sweeping as [the company] conceives it to be." *Id.* So because the NLRB did not find that the statutory right was infringed, it "had no occasion to determine whether [the company] had 'waived' its section 8(b)(1)(B) right, 'clearly and unmistakably' or otherwise." *Id.* "[I]nstead, the key question is simply whether [the union] infringed that right, either by unreasonably invoking the interest arbitration clause, or by bargaining in bad faith before invoking the clause." *Id.* at 1363.

The D.C. Circuit called the company's argument "misguided" and rejected its reliance on *Edison*. *See id.* at 1362 & n.16. It explained that "'[w]aiver' is a concept that operates to counter claims that a recognized right has been infringed; it does not apply beyond the scope of the right that has allegedly been invaded." *Id.* at 1362. In other words, because the NLRB found that the company's alleged statutory right had not been infringed, and the D.C. Circuit agreed, the court declined the company's invitation to broaden that right and then look for waiver of such right in the CBA. *Id.*

Brent's clear-and-unmistakable-waiver argument would make more sense if the arbitration clause prevented Brent from bringing an unfair labor practice charge against the Union or if the NLRB had decided against Brent on such a

43

charge. But without an infringement of a statutory right, or even an alleged infringement of such a right, it makes no sense to search for a clear-and-unmistakable waiver. Like the employer's asserted right in *West Coast Sheet Metal*, Brent's asserted statutory right sweeps far more broadly than the statute and caselaw on which Brent bases its alleged right. *See* 938 F.2d at 1360. We therefore reject Brent's waiver argument.

### B.   Brent's statutory rights do not excuse it from its contractual obligations.

Any statutory rights Brent has under 29 U.S.C. § 158(d) or § 158(f) do not excuse Brent from complying with its contractual agreement.[16] Our governing precedent, *McElroy's*, reinforces *Borg-Warner*'s rule that a party's contractual agreement is binding and enforceable even if that party is not under a statutory obligation to negotiate those terms. *See Borg-Warner*, 356 U.S. at

---

[16] The Union and amici NECA and International Brotherhood of Electrical Workers dispute whether Brent has any statutory rights under § 159(a) and § 158(d) because Brent and the Union had a bargaining relationship under § 158(f) for "employees engaged . . . in the building and construction industry . . . ." § 158(f); *see* Resp. Br. at 50–51; Amicus Br. at 18–20. Parties with a Section 8(f) relationship have no statutory duty to negotiate a successor agreement. *McElroy's*, 500 F.3d at 1097. So because Brent had no statutory § 158(d) duty to bargain over mandatory subjects, the Union argues that Brent had no statutory § 158(d) right to not bargain over permissive subjects. Brent replies that the evergreen clause kept their statutory relationship and thus their § 158(d) rights alive past the 2018 CBA's expiration. We need not decide this issue here because the parties' status under § 159(a) or § 158(f) does not change the parties' contractual agreement in the 2018 CBA. And even assuming Brent is correct that it had § 158(d) rights throughout the duration of the 2018 CBA, Brent does not demonstrate that those rights were infringed. *See* Discussion § IV(A), *supra*.

349 ("Each of the two controversial [nonmandatory] clauses is lawful in itself. Each would be enforceable if agreed to by the unions." (footnote omitted)). In *McElroy's*, a company challenged the imposition of a renewed pre-hire agreement where, as here, the parties' relationship was governed by Section 8(f) of the NLRA, § 158(f). 500 F.3d at 1097. The company argued that it had no statutory obligation to negotiate the new pre-hire agreement. *Id.* at 1096–97. The union sought enforcement of an arbitration award directing the parties to renew the agreement. *Id.* at 1095. The previous agreement had an "extension clause" (like the evergreen clause here, Section 1.02(c)), and an interest-arbitration clause (like Section 1.02(d)). *Id.* The district court confirmed the arbitrator's award of the new agreement and the company appealed. *Id.* at 1096. We framed the ultimate question on appeal as "whether the agreement bound [the company] to engage in interest arbitration." *Id.* The company made parallel arguments[17] to those Brent makes here, which we rejected:

> While we agree that [the company] is under no statutory obligation to negotiate a renewal contract, we conclude that the terms of the pre-hire agreement—specifically the extension and interest arbitration clauses—create a contractual obligation to do so when one party timely gives notice of reopening. Nothing in the NLRA, the NLRB's decisions, or this Court's precedent releases [the company] from this bargained-for contractual obligation.

*Id.* at 1097.

---

[17] Though the company in *McElroy's* argued that it had no statutory duty to negotiate, Brent argues that it has a statutory right to not negotiate. We see these arguments as two sides of the same coin.

We explained that "while unilateral termination of a pre-hire collective bargaining agreement prior to expiration is prohibited, nothing in the NLRA prohibits either party from repudiating a pre-hire obligation upon its expiration. Whether the contract itself permits repudiation, however, is another matter." *Id.* We also rejected the company's argument that because it had not engaged in active negotiations to renew the agreement, no "deadlock" triggered the interest-arbitration clause. *Id.* at 1099. We reasoned that "[t]his argument is valid only if the parties have no obligation to negotiate a renewal agreement in the first place." *Id.* We therefore affirmed the district court's enforcement of the renewal agreement. *Id.*

Here, as in *McElroy's*, the interest-arbitration clause in the 2018 CBA was a bargained-for contractual obligation that Brent freely agreed to and that, by its own terms, either party could trigger unilaterally if renewal negotiations broke down. As the Union points out, *McElroy's* "is in harmony with other Circuit Courts, which similarly have held employers to interest-arbitration awards where employers have asserted the absence of a statutory bargaining duty as justification for refusing to comply with them." Resp. Br. at 34. Indeed, most circuits and the NLRB have distinguished statutory from contractual obligations and held employers to their contractual agreements to arbitrate.[18]

---

[18] *See, e.g.*, *Coca-Cola Bottling Co. of New York v. Soft Drink & Brewery Workers Union, Loc. 812, Int'l Bhd. of Teamsters*, 39 F.3d 408, 410 (2d Cir. 1994) ("If the parties elect to include in their agreement a provision governing

*(footnote continued)*

46

Brent does not attempt to distinguish or grapple with *McElroy's* in its

reply brief. Nor does it wrestle with the vast weight of authority holding parties

---

a matter not subject to mandatory bargaining and also adopt a broad arbitration clause, nothing in [*Local No. 38*], labor law, or the Arbitration Act precludes arbitration of a dispute concerning the meaning or application of that provision"); *Loc. Union No. 666, Int'l Bhd. of Elec. Workers v. Stokes Elec. Serv., Inc.*, 225 F.3d 415, 422, 425 (4th Cir. 2000) (distinguishing statutory and contractual obligations and enforcing CIR award after union invoked interest-arbitration clause despite the NLRB finding that the company's refusal to bargain was based on good-faith doubt about the union's majority status and no unfair labor practice occurred); *Sheet Metal Workers Int'l Ass'n Local 110 Pension Tr. Fund v. Dane Sheet Metal, Inc.*, 932 F.2d 578, 582 (6th Cir. 1991) (observing that, though "[a]rbitration does not create a bargaining obligation, . . . the contract itself may create a bargaining obligation, just as the contract may provide for interest arbitration if the bargaining breaks down"); *Sheet Metal Workers Loc. Union No. 20 v. Baylor Heating & Air Conditioning, Inc.*, 877 F.2d 547, 551 & n.4 (7th Cir. 1989) (distinguishing contractual and statutory duties to bargain and holding that "when the underlying controversy is primarily contractual, the Board should defer to the courts"); *Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec.*, 121 F.3d 1180, 1185–86 (8th Cir. 1997) (discussing distinction between contractual and statutory duty to bargain and holding that the interest-arbitration clause under a Section 8(f) pre-hire agreement was binding and enforceable); *Beach Air Conditioning & Heating v. Sheet Metal Workers Int'l Ass'n, Loc. Union No. 102*, 55 F.3d 474, 477 (9th Cir. 1995) (observing that the company had a "statutory right to walk away from the agreement upon its expiration, without submitting to arbitration" but that "[t]he contract is another matter" and affirming prior rulings enforcing interest-arbitration clauses "because the contract imposes not only a duty to accept a settlement imposed by the arbitrators once negotiations fail, but also a duty to negotiate in the first place"); *see also Rd. Sprinkler Fitters Loc. Union No. 669 v. N.L.R.B.*, 676 F.2d 826, 831 (D.C. Cir. 1982) ("This statutory duty to bargain is independent of any obligation the employer may incur under his contract with the union."); *Collier Electric*, 296 NLRB at 1098 (holding that a union is "free to seek enforcement of its contractual rights by submitting the unresolved bargaining issues to interest arbitration, and by pursuing a Section 301 suit in court, without violating Section 8(b)(3) or Section 8(b)(1)(B) of the Act" so long as the arbitration provision "arguably binds the employer to the arbitration provision" and does not "contain[] language explicitly stating that an employer who has withdrawn from the multiemployer association is not bound to interest arbitration").

to their contractual agreements to arbitrate. Instead, it dismisses the Union's

contractual-obligation arguments as "inconsequential where it must be

determined whether a protected right has been waived." Reply Br. at 16. But as

explained above, Brent's waiver arguments are misplaced, and Brent points to

no statutory right that trumps its contractual agreement to arbitrate.

We turn next to Brent's public-policy arguments.

**V.    Imposing permissive subjects of bargaining in interest arbitration does not violate public policy.**

Brent urges us to join a minority of circuits that have held that imposing

permissive subjects of bargaining in arbitration violates public policy. We first

consider the Court's guidance for when an arbitral award may be void for

violating public policy. In general, "courts are not authorized to consider the

merits of an award," because "[t]he federal policy of settling labor disputes by

arbitration would be undermined if courts had the final say on the merits of the

awards." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 36 (1987)

(citation omitted). Rather, "arbitral decisions" are typically "insulat[ed] . . .

from judicial review." *Id.* at 37. This highly deferential standard means that an

arbitral award is legitimate if it "draws its essence from the collective

bargaining agreement" and if "the arbitrator is even arguably construing or

applying the contract and acting within the scope of his authority." *Loc. No. 7,*

*United Food & Com. Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223,

48

1227 (10th Cir. 2000) (first quoting *Enterprise Wheel*, 363 U.S. at 597; and then quoting *Misco*, 484 U.S. at 38).

But this deference to the merits of an arbitral award is subject to one narrow exception: courts may set aside an award when it contravenes "some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 43 (cleaned up). In *Misco*, the Court refused to vacate an arbitral award on public-policy grounds where the award reinstated a drug-user employee. *Id.* at 32–33. Examining *Misco* in a later opinion, the Court framed the inquiry as not "whether [the worker's] drug use itself violates public policy, but whether the agreement to reinstate him does so." *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62–63 (2000). It explained that the inquiry, more specifically, should be: "[D]oes a contractual agreement to reinstate [the worker] with specified conditions, run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" *Id.* at 63 (citation omitted).

So our inquiry here is whether the 2021 CBA's inclusion of permissive subjects of bargaining runs "contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law." *Id.* The Union and amici NECA and the International Brotherhood of Electrical Workers agree that a *second-generation* interest-arbitration clause (also known as a self-

49

perpetuating interest-arbitration clause) *would* violate public policy. Second-generation interest-arbitration clauses are "interest arbitration clauses [that are] included within an interest arbitration award" so that the interest-arbitration process is self-perpetuating and "a party may find itself locked into having that procedure imposed on it for as long as the bargaining relationship endures." *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n., Loc. 38*, 288 F.3d 491, 505 (2d Cir. 2002), *vacated*, *rev'd on other grounds*, 538 U.S. 918 (2003). Many courts have held that public policy prevents such clauses from being imposed. *See, e.g.*, *Loc. 58, Int'l Bhd. of Elec. Workers v. Se. Michigan Chapter, Nat'l Elec. Contractors Ass'n, Inc.* (*Local 58*), 43 F.3d 1026, 1032 (6th Cir. 1995) ("[A]n arbitrator may not use an interest arbitration clause as a means of self-perpetuation, and . . . this type of 'second generation' interest arbitration clause cannot be included over another party's objection."); *Am. Metal Prods., Inc. v. Sheet Metal Workers Int'l Ass'n, Loc. Union No. 104* (*American Metal*), 794 F.2d 1452, 1456–58 (9th Cir. 1986) (affirming district court's enforcement of CIR interest-arbitration award apart from the second-generation interest-arbitration clause); *Aldrich Air Conditioning*, 717 F.2d at 459 ("[A]n interest arbitration clause is unenforceable insofar as it applies to the inclusion of a similar clause in a new collective bargaining agreement."); *Milwaukee Newspaper & Graphic Commc'ns Union v. Newspapers, Inc.*, 586 F.2d 19, 21 (7th Cir. 1978) (affirming district court's enforcement of CIR

interest-arbitration award apart from the second-generation interest-arbitration clause).

We have not yet decided that issue and we need not decide it here because the CIR did not impose a self-perpetuating, or second-generation interest-arbitration clause in the 2021 CBA. Rather, when the CIR imposed the 2021 CBA, it changed Section 1.02(d) of the 2018 CBA so that the parties must mutually agree to "submit the unresolved issues to the [CIR] for adjudication." App. vol. IV, at 272–73. Under the 2021 CBA, if one party does not want to "renew, modify, or extend" the agreement, or "submit the unresolved issues to the [CIR]," then either party may terminate the agreement upon "a ten (10) day written notice."[19] *Id.* This means that the CBA is not self-perpetuating, because

---

[19] The new 2021 CBA clauses in full are:

(d). In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the [CIR], either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e). By mutual agreement only, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly, with the Union, submit the unresolved issues to the [CIR] for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the [CIR] following the expiration date of this Agreement or any subsequent anniversary date. The [CIR's] decisions shall be final and binding.

(*footnote continued*)

both parties must either agree to a new CBA, or agree to arbitration; otherwise, one party may terminate the agreement.

Brent generates a long string cite in support of its argument that arbitration awards that "purport to impose upon an employer a permissive subject of bargaining" are "contrary to law and public policy." Op. Br. at 37; *see id.* at 37–39 (collecting cases). But as the Union points out, four of the seven circuit cases Brent cites are "inapposite" because their public-policy discussions condemn imposing second-generation interest-arbitration clauses specifically, and do not speak to the imposition of permissive subjects of bargaining in general. Resp. Br. at 40–41 (citing *Local 58*, 43 F.3d at 1032; *American Metal*, 794 F.2d at 1457–58; *Aldrich Air Conditioning*, 717 F.2d at 459; *Milwaukee Newspaper & Graphic*, 586 F.2d at 21). Brent seems to argue that because imposing a self-perpetuating interest-arbitration clause in arbitration violates public policy, and self-perpetuating interest-arbitration clauses are permissive subjects of bargaining, then the imposition of permissive subjects of bargaining violates public policy. This logical fallacy is easily dismissed.

More worthy of examination is Brent's reliance on cases from the Second, Fifth, and Sixth Circuits that ostensibly support its argument that "[a]s

---

App. vol. IV, at 272–73.

applied to nonmandatory subjects, an interest arbitration provision is contrary to national labor policy because it deprives the parties of their right to insist on excluding nonmandatory subjects from the collective bargaining agreement." Op. Br. at 30 (quoting *N.L.R.B. v. Sheet Metal Workers Int'l Ass'n, Loc. Union No. 38* (*Local Union No. 38*), 575 F.2d 394, 399 (2d Cir. 1978)).

In *Local Union No. 38*, a union had bargained to impasse about a second-generation interest-arbitration clause, among other provisions. *Id.* The Second Circuit explained that the NLRA prohibits "insistence on a nonmandatory subject to impasse, that is, making agreement on a nonmandatory subject a condition to any agreement." *Id.* at 398. The Second Circuit then more broadly held that "an interest arbitration provision of a collective bargaining agreement is void as contrary to public policy, insofar as it applies to nonmandatory subjects." *Id.*

Though that case ostensibly supports Brent's position, the Second Circuit has since clarified that *Local Union No. 38*'s rule applies only when there is no pre-existing contract. *See Coca-Cola Bottling Co. of New York v. Soft Drink & Brewery Workers Union, Loc. 812, Int'l Bhd. of Teamsters*, 39 F.3d 408, 410 (2d Cir. 1994) (explaining that *Local Union No. 38*'s holding "did not place a similar limit on the arbitrability of disputes arising under an existing contract" because "[i]f the parties elect to include in their agreement a provision governing a matter not subject to mandatory bargaining and also adopt a broad arbitration clause, nothing in [*Local No. 38*], labor law, or the Arbitration Act

53

precludes arbitration of a dispute concerning the meaning or application of that provision"). So the Second Circuit's caselaw does not help Brent.[20]

We next consider Brent's reliance on Fifth Circuit caselaw, namely *E.F. Etie*, 1 F.3d at 1464. Though the Fifth Circuit in *E.F. Etie* discussed self-perpetuating interest-arbitration clauses as against national labor policy, it also extended that rule to hold more broadly that, "[i]nsofar as an interest arbitration proceeding forced a party to put nonmandatory issues on the table, it was unenforceable as contrary to that policy." *Id.* at 1476. *E.F. Etie* cited *Local Union No. 38* in support, and, by extension, *Allied Chemical*, on which *Local Union No. 38* also relied. *See E.F. Etie*, 1 F.3d at 1467. But *Allied Chemical* does not support the conclusion Brent draws from these cases.

In *Allied Chemical*, the Court decided that an employer's unilateral midterm modification of retiree benefits for already-retired employees was not an unfair labor practice because such modification did not concern a mandatory subject of bargaining. 404 U.S. at 159–60, 185. The Court did not discuss

---

[20] The Union also critiques *Local Union No. 38* as relying on a mistaken reading of *N.L.R.B. v. Columbus Printing Pressmen & Assistants' Union No. 252* (*Columbus Printing Pressmen*), 543 F.2d 1161, 1169 (5th Cir. 1976). As the Union points out, the Second Circuit undermined its own reliance on *Columbus Printing Pressmen*, because, though the Second Circuit cited it for the proposition that the NLRB "espoused the position we now adopt," it later said that the Fifth Circuit "did not reach the question of the validity of interest arbitration clauses as applied to nonmandatory subjects in general, but did hold such clauses invalid as applied to one of the nonmandatory issues involved in this case, to wit, renewal of the interest arbitration provision itself." *Local Union No. 38*, 575 F.2d at 399.

interest arbitration, and neither did it state that interest arbitration of permissive subjects conflicted with national labor policy. So *E.F. Etie* merely repeated *Local Union No. 38*'s mistaken reading of *Allied Chemical*.[21] We agree with the district court that "Brent Electric's reading of *E.F. Etie* and *Local Union 38* to prohibit interest arbitration of all non-mandatory subjects is incorrect because neither case held that interest arbitration could not resolve non-mandatory subjects when the parties had agreed to interest arbitration for non-mandatory subjects." *Brent Electric*, 2023 WL 5750484, at *9.

---

[21] *Local Union No. 38* extrapolated its policy rule from an overbroad reading of *Allied Chemical*: "The importance of preserving parties' freedom to exclude nonmandatory subjects from labor agreements is acknowledged by the rule that '[b]y once bargaining and agreeing on a permissive subject, the parties . . . do not make the subject a mandatory topic of future bargaining.'" 575 F.2d at 399 (quoting *Allied Chemical*, 404 U.S. at 187). *E.F. Etie* also cited Ninth and Eighth Circuit cases in support of its rule. *See* 1 F.3d at 1476 (citing *Am. Metal Prods., Inc. v. Sheet Metal Workers Int'l Ass'n, Loc. No. 104* (*American Metal*), 794 F.2d 1452, 1467 (9th Cir. 1986); *Sheet Metal Workers' Int'l Ass'n, Loc. 14 v. Aldrich Air Conditioning, Inc.*, 717 F.2d 456, 459 (8th Cir. 1983)). But neither of those cases help Brent here. In *American Metal*, the Ninth Circuit held that an arbitrator cannot impose an interest-arbitration clause over the objection of the parties to the arbitration. 794 F.2d at 1456–57. *American Metal* did not concern enforcement of an interest-arbitration clause that was mutually agreed upon by the parties, as it was here. *See generally id.* at 1453–58. Similarly, the Eighth Circuit in *Aldrich Air Conditioning* held that "an interest arbitration clause is unenforceable insofar as it applies to the inclusion of a similar clause in a new collective bargaining agreement." 717 F.2d at 459. Like *American Metal*, *Aldrich Air Conditioning* concerned a new agreement and not an interest-arbitration provision that the parties had agreed to; these cases predominantly reflect the concern that self-perpetuating interest-arbitration clauses not be imposed in arbitration over a party's objection. So, "[o]nce included in a collective bargaining agreement, however, interest arbitration clauses generally are enforceable." *Aldrich Air Conditioning*, 717 F.2d at 458.

Finally, Brent lists *Sheet Metal Workers, Local Union No. 24 v. Architectural Metal Works, Inc.* (*Architectural Metal*), 259 F.3d 418 (6th Cir. 2001). The real dispute in *Architectural Metal* was whether an extension clause and self-perpetuating interest-arbitration provision could be imposed in arbitration. *See id.* at 430. The Sixth Circuit leaned on a prior case to conclude that any interest-arbitration, extension clause, "and/or any other covenant or condition which did not directly implicate a mandatory subject of collective bargaining . . . shall be deemed null, void, and unenforceable against [the company]." *Id.* at 431. But that prior case (*Local 58*) in turn relied on *Local Union No. 38* for the general proposition that "interest arbitration as to nonmandatory subjects is 'void as contrary to public policy.'" *Local 58*, 43 F.3d at 1032 (quoting *Local Union No. 38*, 575 F.2d at 398).

This line of caselaw collapses under any real scrutiny: If we remove from *Local Union No. 38*, *E.F. Etie*, and *Architectural Metal* any discussion of self-perpetuating interest-arbitration provisions, those cases lack the rigorous inquiry into positive law that the Court in *Eastern Associated Coal* demands to justify a blanket rule prohibiting all permissive subjects of bargaining from being imposed in interest arbitration. *See* 531 U.S. at 62–63. Paraphrasing *Eastern Associated Coal*, "[D]oes [an arbitral award imposing permissive subjects of bargaining in a CBA] run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" *Id.* at 63. We easily

56

conclude that it does not. Brent's cited cases do not reference any "explicit, well-defined, and dominant public policy" to prevent a party from contractually agreeing to arbitration that may impose permissive subjects of bargaining. Indeed, our own precedent and the vast weight of caselaw compel the opposite conclusion: dominant public policy favors holding parties to their contractually agreed obligations. *See, e.g.*, *Borg-Warner*, 356 U.S. at 349 ("[E]ach party is free to bargain or not to bargain, and to agree or not to agree" and "[e]ach of the two controversial [nonmandatory] clauses . . . would be enforceable if agreed to by the unions."); *McElroy's*, 500 F.3d at 1097 ("Nothing in the NLRA, the NLRB's decisions, or this Court's precedent releases McElroy's from this bargained-for contractual obligation."); *Collier Electric*, 296 NLRB at 1098 (holding that a union is "free to seek enforcement of its contractual rights by submitting the unresolved bargaining issues to interest arbitration, and by pursuing a Section 301 suit in court, without violating Section 8(b)(3) or Section 8(b)(1)(B) of the Act").

We acknowledge that Brent's public-policy argument may be colorable. But the Second Circuit has disavowed Brent's interpretation of *Local Union No. 38*, and the Fifth and Sixth Circuit decisions Brent cites rest on dubious foundations. So we decline Brent's invitation to join this circuit minority.

57

**VI.    The CIR did not exceed its authority under the Federal Arbitration Act.**

Under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, a court may vacate an arbitration award where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Id.* § 10(a)(4). Because we do not agree with Brent that it has a statutory right to avoid having permissive subjects of bargaining imposed in arbitration when it agreed to interest arbitration in the 2018 CBA, and because we reject Brent's public-policy arguments, we conclude that the CIR did not exceed its powers.

**CONCLUSION**

We affirm the district court's dismissal of Brent's complaint and grant of the Union's motion for summary judgment confirming the CIR award.